[No. H023549. Sixth Dist. Feb. 20, 2004.]

CITY OF SARATOGA, Plaintiff and Respondent, v.
LESTER F. HINZ, JR., as Executor, etc., Defendant and Appellant.

COUNSEL

Berliner Cohen and Paul A. Pelosi for Defendant and Appellant.

Meyers, Nave, Riback, Silver & Wilson, Michael R. Nave and Stefanie Y. Gandolfi for Plaintiff and Respondent.

## OPINION

**RUSHING, P. J.**—In this eminent domain action, defendant property owner Lester F. Hinz, Jr., appeals a judgment that rejected his challenges to the resolution of necessity adopted by the City of Saratoga (the City) when it decided to condemn an easement over a portion of Hinz's property to improve a private road so that the road might be accepted into the City's system of public streets. The road improvement project was undertaken and financed by the Vessing Road Assessment District (VRAD), a special assessment district composed of property owners who own parcels that adjoin Hinz's property.

Hinz contends the trial court erred when it found that his affirmative defense challenging the validity of the assessment district was barred by the limitations period in Streets and Highways Code section 10400. And if not time-barred, then he challenges the validity of the district, arguing that 100 percent owner-financed districts are not valid under Proposition 218 and that the assessment district is not valid because it confers no general benefit on the surrounding community. Hinz also challenges the resolution of necessity on the grounds that the road improvement project is not a public use and that the City's finding of public interest and necessity in the resolution of necessity was not supported by substantial evidence. We find no error and affirm the judgment.

FACTS

*Early Efforts to Form Vessing Road Assessment District*

This case arises out of efforts to improve Vessing Road in Saratoga. Vessing Road is a private street. It is approximately 900 feet long and 17 to 20 feet wide. It was paved in 1958 and has not been repaved since. Vessing Road connects two public streets, Quito Road and Vessing Court. Quito Road is a thoroughfare. Vessing Court is a landlocked cul-de-sac. The only access to Vessing Court is off of Vessing Road.

In early 1996, 16 of the 20 property owners who reside on Vessing Road and Vessing Court petitioned the City to assist them in improving Vessing

Road to minimum city standards, so that Vessing Road could be dedicated to the City and accepted into the City's system of publicly maintained streets.

Hinz owns an 11-acre parcel located at the corner of Vessing Road and Quito Road. Hinz takes access to his property off of Quito Road and generally does not use Vessing Road for ingress and egress. In the spring of 1996, Hinz learned of the project to improve Vessing Road and told his neighbors that he did not approve of the project.

In 1996 and 1997, the City and the homeowners in the Vessing Road area conducted a series of meetings regarding the possibility of forming a special assessment district to fund the proposed improvements to Vessing Road. Hinz attended a number of these meetings and expressed his objections to the project. The project ultimately included improvements to the road and to the water system that serves Vessing Road and Vessing Court. The City representatives advised the homeowners that the City would not contribute financially to the cost of the proposed improvements and that the improvements would have to be funded 100 percent by the members of the proposed assessment district. The City reasoned that although the project was a public project involving the construction of a road, the properties in the proposed assessment district were the only properties that benefited from the project and that the property owners therefore had to pay the entire cost of the improvement. The City helped the property owners retain legal counsel and a civil engineer to assist them in the formation of the assessment district.

Larry Perlin was the director of public works for the City when the property owners approached the City regarding the project to improve Vessing Road. He was subsequently promoted to city manager and retained responsibility for the project. In February 1997, Perlin circulated a petition to the Vessing Road property owners regarding the formation of an assessment district. At that time, the boundary map for the proposed assessment district included the Hinz property. At the time, Perlin thought it was appropriate to include Hinz's property in the proposed assessment district, since his property abutted Vessing Road and it appeared reasonable to include him in the district.

Shortly thereafter, Perlin changed his mind and circulated a second petition that excluded Hinz's property from the assessment district. Hinz's participation in the project was a topic of discussion from the beginning. According to Perlin, the passage of Proposition 218, which became effective on January 1, 1997, emphasized the need to define the special benefits that a particular property received from an assessment and provided that only those properties that received special benefits can be assessed for the costs of an improvement. After circulating the first petition, Perlin became convinced that Hinz

did not belong in the assessment district because his property did not receive a special benefit from the proposed improvements since his access was off of Quito Road.[1] Perlin was also concerned that Hinz could attack the formation of the district on the ground that he did not receive a special benefit from the district. Hinz does not believe the project will benefit his property.[2]

*Hinz's Quiet Title Action*

Several properties along Vessing Road were encumbered by reciprocal private easements dating back to 1913, which provided that 17 feet on either side of the property lines would be used for ingress and egress by pedestrians and vehicles. This created a 34-foot wide area that was used as a private road. The road was paved in 1958. The paved road ranges in width from 17 to 20 feet. Most of the paved portion of the road that is adjacent to Hinz's property is located on property that belongs to the adjoining landowners, not Hinz's property. In May of 1997, Hinz filed a quiet title action against the City and the members of the VRAD seeking to extinguish the 17-foot wide easement on his property.

*Resolutions Passed by the City Regarding Formation of Assessment District*

On May 21, 1997, the City passed a series of resolutions in connection with the proposed VRAD, including a resolution of intent for the VRAD to reimburse the City for any money the City spent on the improvements, a resolution approving the boundary map for the VRAD, resolutions approving agreements for legal and engineering consulting services, and a resolution of intent to order improvements, which appointed the engineer of the work and called for the preparation of the engineer's report. That same day, Hinz's

---

[1] According to Perlin, prior to the passage of Proposition 218, the voting power of the members of an assessment district was based on the amount of land each member owned within the district. After the passage of Proposition 218, the weight of each member's vote was based on the dollar amount of the member's assessment, not the amount of land owned. (Gov. Code, § 53753, subd. (e)(2).)

Hinz owned an 11.23-acre parcel. The other members of the proposed district owned properties varying in size from .82 to 1.62 acres. Under the pre-Proposition 218 scheme, Hinz would have had significantly more voting power than any of the other members of the proposed district because of the size of his property. At one time, some of the property owners in the proposed assessment district were concerned that Hinz would have a disproportionate vote and thus the ability to hold up the project. According to Perlin, that was no longer the case after the passage of Proposition 218, since voting power was based on the amount of the assessment and not the amount of land owned. Government Code section 53753, subdivision (e)(2) supports Perlin's conclusion.

[2] While Hinz does not think his property will benefit from the project, he questions the propriety of his exclusion from the assessment district. He concedes, however, that this is not an issue on appeal.

attorney advised the City that Hinz would defend against any taking of his property related to the proposed improvements.

Gene Scothorn of Civil Consultants Group was appointed engineer of the work. Scothorn's work on the project included determining the amount of the special benefit attributable to each of the 20 parcels in the VRAD and the dollar amount of each property owner's assessment. In his final report, which was dated November 6, 1997, Scothorn concluded that the street improvements conferred direct and special benefits on the members of the VRAD and that there was no general benefit to the surrounding community or the public in general.[3] The proposed assessments ranged from $24,214 to $46,743.

In mid-March 1999, the trial court ruled against Hinz and in favor of the City and Hinz's neighbors in the quiet title action.

On March 25, 1999, most of the property owners in the proposed assessment district attended a meeting at city hall to review the status of the proceedings and to decide whether to continue with the formation of the assessment district. At that time, the majority of the property owners supported formation of the district. In a report to the city council regarding that meeting, Perlin stated that the property owners had been unsuccessful in developing an alternative to the assessment district for improving Vessing Road, that they remained "eager to fulfill their original objective of improving Vessing Road to a standard that will allow them to dedicate the road to the City for ongoing maintenance purposes," and that "a significant obstacle

---

[3] Scothorn evaluated basic street improvements (grading, paving, land acquisition, local surface drainage, utility relocation, and minor traffic signage), frontage improvements (concrete curb and gutters), water system improvements, and rights-of-way.

Regarding the special benefits attributable to the street improvements, Scothorn stated: "Vessing Road and Vessing Court together form a cul-de-sac approximately 1,250 feet in length. The only purpose of the streets is to provide access to properties fronting either Vessing Road or Vessing Court. The basic street improvements . . . provide special and direct benefit to all parcels dependent on Vessing Road for vehicular ingress and egress from Quito Road. The street improvements will eliminate existing broken pavement and potholes which are considered a nuisance and which could pose a potential safety hazard. Additionally, the improved street surface and the addition of a new drainage inlet will provide for improved local drainage conditions. Accordingly, the costs of said improvements will be distributed equally to all properties within the district."

Regarding the general benefit arising out of the street improvements, Scothorn stated: "Vessing Road and Vessing Court constitute a 'dead-end' street which provides for neither 'thru-traffic' [n]or general vehicular circulation. Because they provide only for local traffic, it can be fairly assumed that vehicles utilizing either Vessing Road or Vessing Court do so to access one or more of the several properties within the district. Whether the purpose of vehicle trips along these streets is for direct access to individual properties by residents and guests, or results from delivery, service, utility or public safety vehicles, the trips are of direct and special benefit to the parcels within the district and no benefit is attributable to other properties in the surrounding community or to the public in general."

to forming the district" had been overcome as a result of the judgment that was entered in the property owners' favor in Hinz's quiet title action.

On April 2, 1999, Hinz sent a letter to the city council, threatening to sue the City if the city council approved the formation of the assessment district.

Shortly thereafter, the owners of 15 of the 20 properties in the proposed assessment district, who accounted for 74 percent of the assessments, voted in favor of forming the district. At a public hearing on April 7, 1999, the city council passed two resolutions, one overruling prior protests to the project on the grounds that they did not constitute a majority protest (Resolution No. 99-17) and one approving the engineer's report, the assessments, and the formation of the district and ordering the improvement (Resolution No. 99-18). According to the latter resolution, construction of the improvements included the "acquisition of all lands, easements and rights-of-way" necessary to complete the project. Hinz attended the April 7, 1999 city council meeting. He did not directly challenge the resolution approving the formation of the assessment district.

*The City's Resolution to Exercise Eminent Domain Power Over Easement on Hinz's Property*

In order to complete the project, the City decided to acquire a permanent easement for ingress and egress over the 17-foot wide, 383-foot long strip of land along the southernmost portion of Hinz's property. That part of Hinz's land was already encumbered by the express easement for ingress and egress for the existing private road. The City sought to acquire similar easements over two other properties that belonged to VRAD members.

The City had the easements appraised. The City's attorney advised the city council that "[t]he easements will encumber no more land than the existing private Vessing Road right-of-way. Due to the fact that the private right-of-way was established by recorded easements, the highest and best use of the right-of-way can only be for ingress and egress. Therefore, because the right-of-way can never be developed or used for any purpose except vehicular and pedestrian access, the City's appraiser placed a nominal value of $1,000 on each easement . . . ."

On August 11, 1999, the City sent Hinz a copy of the appraisal and a written offer to purchase the easement for $1,000. On August 16, 1999, the City sent Hinz and the other property owners written notice that the city council would consider the adoption of a resolution of necessity to condemn the easements at its September 1, 1999 council meeting.

Hinz attended the September 1, 1999 city council meeting, accompanied by his attorney. Hinz's attorney made a formal statement for the record, objecting to the adoption of a resolution of necessity authorizing eminent domain proceedings to acquire an easement over Hinz's property. Hinz argued that the improvement of Vessing Road was a private matter that the City should not be involved in. He also argued that the VRAD "may be legally flawed as to its formation and implementation." He argued that "if the District confers no general public benefit and no portion of the cost of the District is being paid by public funds, then the formation of the District could be a violation of Proposition 218." He asserted that if there was no general benefit to the City "arising from the District," then there was no public convenience or necessity that justified the taking of any property by eminent domain. Hinz also argued that the offer of $1000 was unfair and that he should not be compelled to finance what should be paid for by other parties. He suggested the City pay him fair market value for a full fee interest in the property. He reminded the city council that he had sued the City to erase the private easement from his property and that, although he had lost that action in the trial court, the matter was up on appeal.[4]

Six members of the VRAD, the city manager, the city attorney, and Hinz's attorney spoke at the public hearing. After hearing from the public and reviewing the executive summary and other documents submitted by the city manager, the city council voted four to one to adopt the resolution of necessity to proceed with the eminent domain action (Resolution No. 99-50). After the hearing, the owners of the other two properties who had objected to the proposed taking voluntarily conveyed their easements to the City, obviating the need for any condemnation action against those property owners. The only property owner who continued to object was Hinz. Hinz wants to keep his property the way it is to discourage trespassing and maintain his privacy.

*The City's Eminent Domain Action Against Hinz*

On September 14, 1999, the City filed an eminent domain action against Hinz and obtained an ex parte order for prejudgment possession. On October 4, 1999, the court granted Hinz's motion to stay the order of prejudgment possession on the ground that there is no public use that would support the City's exercise of its power of eminent domain, since the engineer's report "repeatedly indicates that the improvements have no benefit to the public in general." The court thus concluded that there was a reasonable probability that Hinz would prevail in the eminent domain action.

---

[4] We shall take judicial notice of this court's records regarding the disposition of Hinz's appeal in the quiet title action. The appeal was dismissed at the request of Hinz on March 9, 2000, before Hinz's opening brief was filed.

Hinz subsequently filed an answer to the City's eminent domain complaint that asserted a number of affirmative defenses, three of which are the subjects of this appeal. Hinz asserted that the City's eminent domain action is barred (1) because the City's resolution of necessity authorizing the eminent domain action was "influenced and affected by the [City's] gross abuse of discretion"; (2) because the purpose for which his property is to be taken is not a public use; and (3) because the VRAD "is illegal in all respects including, without limitation, its formation and implementation, because the District confers no general benefit to the citizens of the City . . . ." Hereafter, we may refer to the latter defense as the "invalidity defense."

The eminent domain action was bifurcated for the purpose of trial. In the first phase of the trial, the court adjudicated Hinz's defenses and objections to the City's right to exercise its eminent domain power to acquire the easement. The issue of just compensation for the taking was reserved for the second phase of the trial.

At the beginning of trial, the court granted the City's motion in limine to exclude evidence and argument challenging the formation and validity of the VRAD on the ground that such a challenge was barred by the statute of limitations set forth in Streets and Highways Code section 10400. Thus, the court found that Hinz's affirmative defense challenging the validity of the VRAD was time-barred. The court did, however, permit Hinz to introduce extensive, detailed evidence regarding the history and formation of the district as background and because it was relevant to Hinz's other defenses.[5]

The court concluded that Hinz had not met his burden of proving that the City had committed a gross abuse of discretion in adopting Resolution No. 99-50 (Resolution 99-50). The court found that the City was therefore entitled to a conclusive presumption that the public interest and necessity require the project, that the project is planned or located in the manner that would be most compatible with the greatest public good and the least private injury, and that the property sought to be acquired is necessary for the project, as stated in Resolution 99-50. The court overruled Hinz's objections to the City's right to take the property and ordered the stay on the order of prejudgment possession lifted. Hinz did not request a statement of decision.

In July 2001, the parties resolved the issue of compensation and stipulated that $1000 was just compensation for the easement. The court entered its final order of condemnation and judgment on July 20, 2001. Hinz appeals.

---

[5] Hinz introduced 49 documentary and videotape exhibits that dealt with the history and formation of the VRAD prior to the city counsel's adoption of the resolution of necessity authorizing the eminent domain action.

DISCUSSION

## I. *Hinz's Affirmative Defense Asserting the Invalidity of the Assessment District Was Time-barred*

We begin by addressing Hinz's claim that the trial court erred in granting the City's motion in limine and finding that his affirmative defense attacking the validity of the VRAD[6] was barred by the limitations period set forth in Streets and Highways Code section 10400 (hereafter section 10400).

Hinz argues that the limitations period in section 10400 does not apply to this condemnation action for several reasons. First, he argues that section 10400 does not apply to his defenses to the condemnation action. Second, he asserts that the limitations period in section 10400 does not apply because he was not aggrieved by the formation of the VRAD until the City brought the condemnation action against him and that he had no right to challenge the formation of the assessment district prior to that time. Third, he argues that only property owners against whom a special assessment is levied may judicially challenge a special assessment, suggesting that such property owners are the only ones subject to the limitations period in section 10400. Fourth, he asserts that section 10400 does not apply to him, since he did not challenge a specific assessment, but rather sought a finding that the assessment district itself was invalid. Hinz also contends that his challenge to the validity of the assessment district in the eminent domain action does not invalidate the assessments levied against the property owners in the VRAD, since any claims they may have regarding the validity of the assessments are now time-barred.

### A. *Standard of Review and Rules of Statutory Construction*

Since the issue presented involves the interpretation of a statute and the application of that statute to undisputed facts, it is subject to this court's independent or de novo review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; *International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611 [38 Cal.Rptr.2d 150, 888 P.2d 1279].)

"In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.

---

[6] Hinz asserts that the VRAD was invalid (1) because after Proposition 218, 100 percent owner-financed assessment districts are invalid; (2) because the City did not find that the VRAD conferred any general benefit on the City; and (3) because the City did not allocate between general benefit and special benefits to be conferred by the road improvement project when it formed the assessment district.

[Citation.] 'We begin by examining the statutory language, giving the words their usual and ordinary meaning.' [Citations.] If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If there is ambiguity, however, we may then look to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such cases, we ' " 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' [Citation.]" (*Estate of Griswold* (2001) 25 Cal.4th 904, 910–911 [108 Cal.Rptr.2d 165, 24 P.3d 1191], quoting *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].)

### B. *Limitations Period Set Forth in Statute*

Section 10400 provides: "The validity of an assessment or supplementary assessment levied under this division shall not be contested in any action or proceeding unless the action or proceeding is commenced within 30 days after the assessment is levied. Any appeal from a final judgment in such an action or proceeding shall be perfected within 30 days after the entry of judgment."

■ The statute provides a 30-day limitations period on any action or proceeding that challenges the validity of an assessment. Section 10400 provides that the cause of action accrues and the limitations period begins to run when the assessment is "levied." For the purposes of section 10400, an assessment is levied when the governing body passes a resolution that confirms the assessments and orders the proposed improvement to be made. (*Allis-Chalmers v. City of Oxnard* (1980) 105 Cal.App.3d 876, 883 [165 Cal.Rptr. 128]; *O'Keefe v. Atascadero County Sanitation District* (1971) 21 Cal.App.3d 719, 727 [98 Cal.Rptr. 878] (*O'Keefe*); *Fahey v. City Council* (1962) 208 Cal.App.2d 667, 676–679 [25 Cal.Rptr. 314].)

The assessments were levied on April 7, 1999, when the City adopted Resolution No. 99-18, which approved the engineer's report, confirmed the assessments, approved the formation of the district, and ordered the improvements. Assuming section 10400 applies to Hinz's invalidity defense, Hinz had 30 days from April 7, 1999, or until May 7, 1999, to contest the assessments in a legal action. The City filed its eminent domain action on September 14, 1999. Hinz filed his answer asserting the invalidity defense and other defenses on October 19, 1999. Thus, Hinz's challenge was not raised within 30 days of the date the assessments were levied.

## C. *Applicability of Section 10400 to Actions Contesting the Validity of an Assessment District*

■ There is no merit to Hinz's claim that section 10400 does not apply to this action because he is challenging the formation of the district and not the levying of a special assessment. An action challenging the validity of a special assessment district is an action contesting the validity of an assessment within the meaning of section 10400. (*Dawson v. Town of Los Altos Hills* (1976) 16 Cal.3d 676, 682 [129 Cal.Rptr. 97, 547 P.2d 1377] (*Dawson*); *Vogel v. City of Millbrae* (1959) 167 Cal.App.2d 403, 404–405 [334 P.2d 620].)

## D. *Persons Subject to Section 10400*

As for Hinz's contention that only those property owners who have been assessed may judicially challenge the assessment and are therefore subject to the limitations period in section 10400, we note that the party challenging the special assessments in *O'Keefe, supra*, 21 Cal.App.3d at pages 722 and 727–728 did not own property in the special assessment district. The *O'Keefe* court concluded that his challenge to the validity of the assessments was barred under section 10400 because it was filed more than 30 days after the assessments were levied. (*O'Keefe, supra*, 21 Cal.App.3d at pp. 727–729.) The court did not expressly address the question of whether a person who does not own property in the assessment district has standing to challenge a special assessment. However, Streets and Highways Code section 10312, subdivision (a) provides that when a public entity passes a resolution confirming the assessments and ordering the improvement, "[t]he resolution shall be final as to *all persons*, and the assessment thereby levied upon the respective subdivisions of land in the assessment district." (Italics added.) Hinz could have brought a declaratory relief action to determine his rights and duties with respect to the property. (Code Civ. Proc., § 1060.)

■ These authorities lead to the conclusion that the limitations period in section 10400 applies to all persons, including those who do not own property within the assessment district. Furthermore, if we take Hinz's argument to its logical conclusion, Hinz would not be able to judicially challenge the validity of the VRAD in this action, since no special assessment was ever levied against him. These authorities also tend to dispose of Hinz's argument that he had no right to challenge the formation of the VRAD until City filed its condemnation action against him.

## E. *Applicability of Limitations Periods to Defenses: The Rule from Styne v. Stevens*

Hinz also asserts that the limitations period in section 10400 does not apply to his defenses in this eminent domain proceeding. Our Supreme Court

addressed the applicability of statutes of limitation to affirmative defenses in *Styne v. Stevens* (2001) 26 Cal.4th 42, 51–54 [109 Cal.Rptr.2d 14, 26 P.3d 343] (*Styne*). *Styne* was a contract action in which Norton Styne sued entertainer Connie Stevens for money that was allegedly due under an oral contract involving Stevens's association with a cable television network and the sale of her beauty products. As a defense, Stevens asserted that Styne was acting as a talent agent but lacked the license required under the Talent Agencies Act. Styne argued that the defense was barred by the Talent Agencies Act's one-year statute of limitations, found in Labor Code section 1700.44. (*Styne, supra,* 26 Cal.4th at pp. 48–50.)

The court observed that there is a "clear rule that statutes of limitations do not apply to defenses." (*Styne, supra,* 26 Cal.4th at p. 51.) The court explained, "Under well-established authority, a defense may be raised at any time, even if the matter alleged would be barred by a statute of limitations if asserted as the basis for affirmative relief," and observed that "[t]he rule applies in particular to contract actions." (*Ibid.*) The court reasoned that "[s]tatutes of limitations bar 'actions or proceedings' [citation], thus guarding against stale claims and affording repose against long-delayed litigation. . . . [Citation.] . . . [Citation.] . . . [¶] As the United States Supreme Court recently stated in another context, 'the object of a statute of limitation in keeping "stale litigation out of courts," . . . would be distorted if the statute were applied to bar an otherwise legitimate defense to a timely lawsuit, for limitations statutes "are aimed at lawsuits, not the consideration of particular issues in lawsuits." . . . ' [Citation.]" (*Id.* at p. 52, citing *Beach v. Ocwen Fed. Bank* (1998) 523 U.S. 410, 415–416 [140 L.Ed.2d 566, 118 S.Ct. 1408].)

The court also stated that the phrase "actions and proceedings" in Labor Code section 1700.44, subdivision (c) must be construed as referring to claims for affirmative relief and that nothing in the language of section 1700.44 "was intended to bar a mere defense to a claim for relief initiated by another." (*Styne, supra,* 26 Cal.4th at p. 53 [109 Cal.Rptr.2d 14, 26 P.3d 343].) The court concluded that the limitations period in Labor Code section 1700.44, subdivision (c) did not bar the assertion of Stevens's defense based on the Talent Agencies Act. (*Styne, supra,* 26 Cal.4th at p. 54.)

F. *Parties' Assertions Regarding the Applicability of Styne v. Stevens to Section 10400*

We asked the parties to provide us with supplemental briefing addressing the applicability of *Styne* to the statute of limitations issue presented in this case. Hinz argues that *Styne* applies and requires a reversal of the trial court's ruling on the motion in limine.

The City distinguishes this case from *Styne* by arguing that it is an eminent domain action brought to promote public interests and not a contract action or other action brought to enforce private rights. The City argues that section 10400 was not enacted to afford repose to private parties and that its purpose is "to promptly foreclose disruptive and destructive challenges to private funding of public projects—which, . . . often involve the issuance and sale of bonds." As the court noted in *Styne*, the rule precluding application of statutes of limitations to defenses has been applied chiefly in contract actions. (*Styne, supra*, 26 Cal.4th at p. 51; see also 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 423, p. 532.) The City points out that the limitations period at issue here affords litigants the shortest amount of time within which to pursue their claims: 30 days. As the City notes, only a handful of actions, all having to do with challenges to governmental activity, share such a short limitations period. (3 Witkin, *supra*, Actions, § 442, p. 559.)

### G. *Interpretation of Section 10400*

The City attempts to distinguish the limitations period in section 10400 from the Labor Code section at issue in *Styne*, by arguing that the language of the provision at issue here is broader than the language in the code section at issue in *Styne* and therefore applies to defenses.

The limitations period in *Styne* is found in Labor Code section 1700.44, subdivision (c), which provides: *"No action or proceeding shall be brought pursuant to this chapter*[7] *with respect to any violation which is alleged to have occurred more than one year prior to commencement of the action or proceeding."* (Italics added.) The limitations period at issue here, section 10400, provides: "The validity of an assessment or supplementary assessment levied under this division *shall not be contested in any action or proceeding* unless the action or proceeding is commenced within 30 days after the assessment is levied." (Italics added.)

Interpreting the statutory language at issue in *Styne*, the Supreme Court stated: "the Talent Agencies Act limits 'actions and proceedings' [citation] and contains no *exception* for defensive use, though the Legislature must have understood that artists would routinely commence 'proceedings' before the Commissioner, seeking to avoid their contractual commitments by claiming violations of the Act. But the Act's phrase 'actions and proceedings'— which parallels the universal statute of limitations reference to 'actions' (see, e.g., Code Civ. Proc., § 335 et seq.)—must be construed in the same fashion, as referring to claims for affirmative relief. Nothing in the language of section

---

[7] The term "chapter" in Labor Code section 1700.44 refers to chapter 4 of part 6 of division 2 of the Labor Code, which deals with the licensing of talent agents. (Lab. Code, §§ 1700–1700.47.)

1700.44, subdivision (c) suggests that, in contrast with other statutory limitations periods, it was intended to bar a mere defense to a claim for relief initiated by another." (*Styne, supra,* 26 Cal.4th at p. 53.)

As the *Styne* court noted, other limitations statutes contain express references to the defensive use of a limitations period. For example, Government Code section 66499.37 provides for a 90-day limitations period on "[a]ny action or proceeding to attack, review, set aside, void or annul the decision of an advisory agency, appeal board or legislative body concerning a subdivision, . . . . Thereafter all persons are barred from any such action or proceeding or *any defense of invalidity or unreasonableness* of such decision or of such proceedings, acts or determinations. . . ." (Italics added.) Similar language is found in Government Code sections 59670 and 66020, subdivision (d)(2), as well as Streets and Highways Code section 35474.[8] In contrast, the statute at issue here contains no such express reference to defensive use of the limitations period. The question then becomes whether the phrase "shall not be contested in any action or proceeding" in section 10400 is broad enough to encompass defensive use of the limitations period, absent an express statement to that effect.

The City argues that the use of the word "contested" in section 10400 broadens its scope and extends the limitations period to the assertion of defenses. The City relies on the definition of "contest" from Black's Law Dictionary (6th ed. 1990) page 320, which defines the term as: "To assert a defense to an adverse claim in a court proceeding. To oppose, resist, or dispute the case made by a plaintiff or prosecutor. . . . To defend, as a suit or other proceeding." The more recent Black's Law Dictionary (7th ed. 1999) page 314 defines "contest" as: ". . . 2. To litigate or call into question; challenge . . . . 3. To deny an adverse claim or assert a defense to it in a court proceeding . . . ." Merriam-Webster's Collegiate Dictionary (10th ed. 1999) page 250 defines "contest" as: "to make the subject of dispute, contention, or litigation." According to these sources, "contest" applies to both affirmative claims and any defenses that are raised in a lawsuit. Unlike the statutory

---

[8] Government Code section 59670 provides for a 60-day limitations period on actions or proceedings questioning the validity of reassessments or bonds under the Bond Refunding Law of 1931. "Thereafter, all persons are barred from any such action or proceeding or *any defense of the invalidity* of the reassessment or any bonds issued on the reassessment." (Gov. Code, § 59670, italics added.) Government Code section 66020, subdivision (d)(2), contains a 180-day limitations period on actions protesting development fees. Thereafter, "all persons are barred from any action or proceeding or *any defense of invalidity or unreasonableness* of the imposition." (Gov. Code, § 66020, subd. (d)(2), italics added.) Streets and Highways Code section 35474 contains a 30-day limitations period on assessments and bonds under the Parking District Law of 1951. Thereafter "all persons are barred from any such action or proceeding or *any defense of invalidity* of the assessment or reassessment, or of bonds issued on the assessment or reassessment." (Sts. & Hy. Code, § 35474, italics added.)

provision in *Styne*, the use of the term "contested" in section 10400 indicates that the limitations period was intended to bar a defense to a claim for relief initiated by another.

Numerous code provisions contain limitations periods that employ the phrase "shall not be contested in any action or proceeding." (See Code Civ. Proc., § 329.5 [limitations period on assessments for public improvements by chartered cities]; Gov. Code, § 50607 [Open Space Maintenance Act] ; Health & Saf. Code, § 33850 [special assessment areas within redevelopment projects]; Sts. & Hy. Code, §§ 18095 [Street Lighting Act of 1919], 18398 [Street Lighting Act of 1931], 22132 [Tree Planting Act of 1931], 22675 [Landscaping and Lighting Act of 1972], 36537 [Parking and Business Improvement Area Law of 1989], and 36633 [Parking and Business Improvement Area Law of 1994]; Stats. 1986, ch. 987, § 18, p. 3245, West's Ann. Wat.—Appen. (2004 supp.) ch. 36-19.19, p. 85; Stats. 1987, ch. 1055, § 24, p. 3582, West's Ann. Wat.—Appen. (2004 supp.) ch. 43-26.12, p. 146; Stats. 1987, ch. 438, § 24, p. 1632, West's Ann. Wat.—Appen. (2004 supp.) ch. 46-37.1, p. 186; Stats. 1987, ch. 669, § 14.5, p. 2129, West's Ann. Wat.— Appen. ch. 48-26.12, pp. 213–214; Stats. 1991, ch. 704, § 4.5, pp. 3153–3154, West's Ann. Wat.—Appen. (1995 ed.) ch. 130-120, p. 859 [local flood control, watershed protection, and water conservation acts].)

The City does not cite and our research has not revealed any cases that interpret the phrase "shall not be contested in any action or proceeding" as it is used in these statutes. As noted above, the phrase only appears in limitations provisions involving governmental action.

One of the reasons for the short limitations period in section 10400 is the need for finality in the levying of assessments. As the court noted in *Allis-Chalmers*: "It is a fact of common knowledge that the mere existence of a lawsuit usually prevents the sale of bonds and the raising of the funds required to do the work of improvement for which the special assessment has been levied. [Citation.] The short statutes of limitations such as section 10400 are essential to the consummation of the proceedings and to provide assurance to bond buyers that their investment will be reasonably safe and secure." (*Allis-Chalmers, supra*, 105 Cal.App.3d at p. 883.)

██ For the foregoing reasons, we conclude that the phrase "shall not be contested in any action or proceeding" is broad enough to encompass defensive use of the limitations period. The holding from *Styne*, therefore, does not apply to the statute at issue here and the trial court was correct when it concluded that the limitations period in section 10400 bars Hinz from asserting the invalidity defense.

In addition, the trial court's ruling on the motion in limine did not prejudice Hinz. First, our Supreme Court has concluded that evidence of proceedings to assess property is irrelevant to an action to condemn property that has not been assessed and that is not located within the assessment district. (*San Francisco v. Kiernan* (1893) 98 Cal. 614, 623 [33 P. 720].) Whether the property of the members of the VRAD was validly assessed or not has "no possible bearing or effect upon any material issue" in the condemnation action against Hinz. (*Ibid.; Alameda v. Cohen* (1901) 133 Cal. 5, 10–11 [65 P. 127].) Second, very little evidence related to the formation of the VRAD was in fact excluded from the trial of the action. The evidence that was ruled inadmissible was excluded on the grounds of relevance either because it involved the value of the property, which was not before the trial court, or was not before the city council when it voted on the resolution of necessity. The court heard extensive evidence regarding the formation of the VRAD, which was admitted as background to inform the court of the history of the formation of the district and because the city council had considered the history of the project in approving the resolution of necessity.

In light of our conclusion, we shall not reach the parties' arguments regarding whether section 10400 contains a substantive provision rather than a procedural limitations period or the City's contention that the statute of limitations applies to Hinz's invalidity defense because he sought affirmative relief.

Furthermore, in view of our conclusion that Hinz's invalidity defense was barred by the statute of limitations, we shall not reach Hinz's arguments on the merits of the defense. As to this point, we again note our Supreme Court's holdings in *San Francisco v. Kiernan, supra,* 98 Cal. 614 and *Alameda v. Cohen, supra,* 133 Cal. 5, 10–11 that any challenge to the validity of the assessments is irrelevant to this eminent domain action. Since Hinz's invalidity defense is subject to the limitations periods set forth in section 10400, we also conclude that Hinz's appeal is time-barred as to that issue, since it was filed more than 30 days after entry of judgment.[9]

---

[9] Section 10400 provides: "Any appeal from a final judgment in [an action contesting the validity of an assessment or a supplemental assessment levied under the Municipal Improvement Act of 1913] shall be perfected within 30 days after the entry of judgment." The final judgment of condemnation was entered on July 20, 2001. Hinz filed his notice of appeal on September 17, 2001, more than 30 days after the judgment was entered.

## II. *Hinz's Other Challenges to the City's Eminent Domain Action*

### A. *Legal Requirements for a Taking*

As we explained in *Santa Cruz County Redevelopment Agency v. Izant* (1995) 37 Cal.App.4th 141, 148 [43 Cal.Rptr.2d 366] (*Izant*), " ' "The power of eminent domain is an inherent attribute of sovereignty." ' [Citations.] The government's eminent domain power has two important constitutional limitations. [Citation.] First, property may only be taken or damaged for a public use. (U.S. Const., Amends. V, XIV; Cal. Const., art. I, § 14; [citation.].) Second, just compensation must be awarded for properties taken. (Cal. Const., art. I, § 14.)"

"The exercise of the eminent domain power requires a finding of public necessity. ([Code Civ. Proc.,] § 1240.030.) There are three elements to such a finding. First, public interest and necessity must require the project. Second, the project must be planned or located in the manner that will be most compatible with the greatest public good and the least private injury. Third, the property sought to be acquired must be necessary for the project. ([Code Civ. Proc.,] § 1240.030; see also *Redevelopment Agency v. Norm's Slauson* (1985) 173 Cal.App.3d 1121, 1125 [219 Cal.Rptr. 365] [(*Norm's*)].)

"A public agency must hold a hearing to consider whether the taking meets these three criteria. ([Code Civ. Proc.,] § 1245.235; [*Norm's*], *supra*, 173 Cal.App.3d at p. 1125.) The person whose property is to be acquired must be given notice and an opportunity to be heard. ([Code Civ. Proc.,] § 1245.235; [citation.].) After the hearing, if the agency decides the taking meets the criteria, then it must adopt a resolution of necessity. ([Code Civ. Proc.,] §§ 1240.040; 1245.220.) A resolution of necessity is a prerequisite to beginning a condemnation action. ([Code Civ. Proc.,] §§ 1240.040, 1245.220.)

"Once a resolution of necessity is adopted, the resolution conclusively establishes the three criteria set forth under [Code of Civil Procedure] section 1240.030. ([Code Civ. Proc.,] § 1245.250.) However, a person having an interest in property described in a resolution of necessity may still obtain judicial review of the validity of the resolution. ([Code Civ. Proc.,] § 1245.255.) Review is available before the eminent domain action via a writ of mandate pursuant to [Code of Civil Procedure] section 1085. ([Code Civ. Proc.,] § 1245.255.) Review is also available after the commencement of the eminent domain proceeding by objection to the right to take. ([Code Civ. Proc.,] § 1245.255; [citations].)" (*Izant, supra,* 37 Cal.App.4th at pp. 148–149, fn. omitted.)

Hinz objected to the taking on various grounds in his answer. Two additional defenses are at issue on appeal. First, he objects to the taking on

the grounds that the City's resolution of necessity was affected by a gross abuse of discretion. Second, he contends that the purpose for which his property is being taken is not a public use.

### B. *Defense Alleging Gross Abuse of Discretion by the City*

■ "A resolution of necessity will not have a conclusive effect as to the three criteria set forth under [Code of Civil Procedure] section 1240.030 'to the extent that its adoption or contents were influenced or affected by gross abuse of discretion by the governing body.' ([Code Civ. Proc.,] § 1245.255, subd. (b); *Anaheim Redevelopment Agency v. Dusek* (1987) 193 Cal.App.3d 249, 255 [239 Cal.Rptr. 319].) A gross abuse of discretion may be shown by a lack of substantial evidence supporting the resolution of necessity. [Citation.] It may also be shown where at the time of the agency hearing, the condemnor had irrevocably committed itself to the taking of the property regardless of the evidence presented. ([*Norm's*], *supra*, 173 Cal.App.3d 1121 [219 Cal.Rptr. 365].)" (*Izant, supra*, 37 Cal.App.4th at p. 149, fns. omitted.) Hinz assets both that there is a lack of substantial evidence supporting the City's resolution of necessity and that the City had irrevocably committed itself to the taking before the hearing on the resolution.

#### 1. *Standard of Review Regarding Alleged Gross Abuse of Discretion*

The adoption of a resolution of necessity is a legislative act and by choosing the more deferential " 'gross abuse of discretion' " standard, "the Legislature evidenced an intent to narrowly circumscribe the scope of judicial review" of legislative determinations of necessity. (*Anaheim Redevelopment Agency v. Dusek, supra*, 193 Cal.App.3d at pp. 255, 258.) The trial "court reviews the agency's decision for a gross abuse of discretion to determine whether adoption of the resolution of necessity was arbitrary, capricious, or entirely lacking in evidentiary support. The court must not 'retrace the legislative body's analytic route when the statutory scheme requires much greater deference to the condemning body's determination of necessity.' [Citation.]" (*Izant, supra*, 37 Cal.App.4th at p. 150.) The trial court's review of the validity of the resolution of necessity is limited to a review of the agency's proceedings; no additional evidence may be admitted. (*Ibid.*)

■ In reviewing the trial court's determination on the question of whether the public agency has committed a gross abuse of discretion, appellate courts apply the standard of review applicable to ordinary mandamus. In such cases, the appellate court " 'is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. [Citation.] However, the appellate court may make its

own determination when the case involves resolution of questions of law where the facts are undisputed.' [Citations.]" (*Redevelopment Agency of the City of Chula Vista v. Rados Bros.* (2001) 95 Cal.App.4th 309, 317 [115 Cal.Rptr.2d 234], fn. omitted.)

### 2. Substantial Evidence Supports the City's Resolution of Necessity

Hinz argues that the City's adoption of the engineer's report, which contained a finding that the VRAD does not confer any "general benefit," in Resolution No. 99-18 (Resolution 99-18) prevents the City from condemning his property. He asserts that a finding of no general benefit in Resolution 99-18 means there could not possibly have been substantial evidence to support the trial court's order upholding the City's finding that public interest and necessity require the project in Resolution 99-50. Hinz contends that these two findings are inconsistent and that the City did nothing to address or resolve the "blatant conflict" between its initial finding that the VRAD conferred no general benefit and its later finding that public interest and necessity require the project. Hinz asserts that "general benefit" encompasses the same elements as "public interest and necessity." We disagree.

Hinz cites no legal authority for the proposition that "general benefit" means the same thing as "public interest and necessity." The City focuses on the evidence at trial and argues that the evidence shows that these two concepts are not synonymous. According to the City, engineer Scothorn explained the factors he relies on in determining whether a public project will provide a general benefit and they are nothing like those used to determine whether there is a public necessity for a proposed project. Scothorn testified that the two concepts are "[a]bsolutely two different things." Scothorn stated that "[t]here are, within the purview of assessment engineering, a variety of tests that we make as to whether or not a benefit either benefits the general public or it benefits an individual property as a special benefit . . . ." According to Scothorn, there is nothing inconsistent in his conclusion that there was no general benefit and the fact that the improvement of Vessing Road is a public improvement project.

Hinz argues that Scothorn's testimony is irrelevant to the issue presented here, since the interpretation of the legal terms "general benefit" and "public interest and necessity" is a question of law for the court. We agree that the question presented, whether the phrase "general benefit" is synonymous with "public interest and necessity," is a question of law for this court to determine.

We begin our analysis by noting that the concepts that Hinz alleges are synonymous are terms of art in assessment district law and eminent domain

law. Assessment district law was modified in 1996, when the voters adopted Proposition 218, the " 'Right to Vote on Taxes Act.' " (*Howard Jarvis Taxpayer Assn. v. City of San Diego* (1999) 72 Cal.App.4th 230, 235 [84 Cal.Rptr.2d 804].) "The stated purpose of Proposition 218 was to 'protect[] taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent.' (Prop. 218, Gen. Elec. (Nov. 5, 1996) § 2, p. 108.) The proposition generally provides for taxpayer approval for the adoption, extension or increase of taxes or assessments. Proposition 218 added article XIII C involving general and special taxes and article XIII D involving assessments" to the California Constitution. (*Howard Jarvis Taxpayer Assn. v. City of San Diego, supra,* 72 Cal.App.4th at p. 235.)

The parties do not cite any definitions of "general benefit." Article XIIID of the California Constitution does not expressly define "general benefit." However, it provides that a general benefit is something that benefits the public at large, whereas a special benefit benefits only the property owners within the assessment district. (Cal. Const., art. XIIID, § 4, subd. (f).)

Article XIIID defines " '[a]ssessment' " and " '[s]pecial benefit.' " Review of those definitions is helpful to our analysis. Article XIIID, section 2 provides: "As used in this article: [¶] . . . [¶] (b) 'Assessment' means any levy or charge upon real property by an agency for a special benefit conferred upon the real property." (Cal. Const., art. XIIID, § 2, subd. (b).) It also defines " '[s]pecial benefit' as 'a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large. General enhancement of property value does not constitute "special benefit." ' " (Cal. Const., art. XIIID, § 2, subd. (i).)

The Proposition 218 Omnibus Implementation Act, (Act) defines "[a]ssessment" for the purposes of article XIIID and the Act as: "any levy or charge by an agency upon real property that is based upon the special benefit conferred upon the real property *by a public improvement or service,* that is imposed to pay the capital cost of the public improvement, the maintenance and operation expenses of the public improvement, or the cost of the service being provided." (Gov. Code, § 53750, subd. (b), italics added.)

Under Proposition 218, only special benefits are assessable. (Cal. Const., art. XIIID, § 4, subd. (a).) Local governments may not impose assessments to pay for the cost of providing a general benefit to the community and are directed to "separate the general benefits from the special benefits conferred on a parcel." (*Ibid.*) No property owner's assessment may exceed his or her proportionate share of the cost of the special benefit. (*Ibid.*) In addition, public entities that own property within a district shall not be exempt from assessment, unless they can demonstrate by clear and convincing evidence that they receive no special benefit. (*Ibid.*)

In concluding that article XIIID is consistent with decisional law prior to the adoption of Proposition 218, our Supreme Court explained: "[A]n improvement that was the subject of a special assessment had to *specially benefit* the assessed property. . . . A special assessment was levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement, . . . [Citation.] Because the rationale of a special assessment was that the assessed property had received or would receive a special benefit over and above that received by the general public (*ibid.*), the amount of the assessment could not exceed the benefit to the property [citation]." (*Ventura Group Ventures, Inc. v. Ventura Port Dist.* (2001) 24 Cal.4th 1089, 1106 [104 Cal.Rptr.2d 53, 16 P.3d 717].)

The Legislative Committee comment to Code of Civil Procedure section 1240.030, which sets forth the requirements to exercise the power of eminent domain defines "public interest and necessity" as follows: " 'Public interest and necessity' include all aspects of the public good including but not limited to social, economic, environmental, and esthetic considerations." (Legis. Com. com., 19 West's Ann Code Civ. Proc. (1982 ed.) foll. § 1240.030, p. 490.) "Public use and necessity are to be construed liberally in favor of the condemnor." (*Shell Cal. Pipeline Co. v. City of Compton* (1995) 35 Cal.App.4th 1116, 1125 [41 Cal.Rptr.2d 753].)

■ Our analysis is aided by a review of the nature of special assessment districts. "A special assessment district—unlike other public districts such as irrigation districts and reclamation districts—is not a legal entity with officers and corporate rights and duties. [R]ather such a district, in the words of the Municipal Improvement Act of 1913 [under which the City proceeded], is merely 'the district of land to be benefited by the improvement and to be specially assessed to pay the costs and expenses of the improvement and the damages caused by the improvement.' (Sts. & Hy. Code, § 10008.)" (*Dawson, supra,* 16 Cal.3d at pp. 682–683, fn. omitted.) Improvement projects undertaken by special assessment districts include "all work and improvements authorized to be done under [the Municipal Improvement Act of 1913] which are *for a public purpose or which are necessary or incidental to a public purpose.*" (Sts. & Hy. Code, § 10002, italics added.) Thus, special assessment districts are formed for purposes that are public in nature.

The fact that the municipality is required to distinguish between the special and general benefits to be derived from the project during the assessment process does not detract from the inherently public nature of the project. The fact that a particular improvement project does not confer any general benefit on the community at large does not make the project any less public. This is particularly true in this case.

The project included widening and resurfacing the existing private road to bring it up to minimum city standards, so that it might be dedicated to the City. The private road, which had not been paved since 1958, is 17 to 20 feet wide. The City's minimum public standards require that it be 26 feet wide. In addition, the City requires three feet on either side of the road for the installation of utilities. The improvements included the installation of pavement, curbs, gutters, driveway aprons, striping, signage, retaining structures, and a 620-foot long water transmission system. The water system improvements included installation of meters and a fire hydrant.

The road will connect Vessing Court, a public street, with Quito Road, another public street. The engineer concluded that the project does not confer any general benefit because Vessing Road and Vessing Court "constitute a 'dead-end' street which provides for neither 'thru-traffic' [n]or general vehicular circulation." The engineer noted that travel along Vessing Road and Vessing Court is local in nature and does not benefit the properties in the surrounding community or the public in general. The engineer also opined that there was no quantifiable general benefit attributable to the water system improvements.

The fact that this project does not confer any general benefit for assessment purposes does not detract from the inherently public nature of the project. If we were to accept Hinz's argument, then there would never be a public interest or necessity in the construction of local street improvements that benefit a small area, especially those involving dead-end streets and cul-de-sacs. For the foregoing reasons, we conclude that "general benefit" and "public interest and necessity" are not the same and that the trial court did not err when it upheld the City's finding of public interest and necessity.

### 3. The City Had Not Irrevocably Committed Itself to the Taking

Hinz also argues that the taking was affected by a gross abuse of discretion because the City was irrevocably committed to the condemnation of his property after it adopted Resolution 99-18 in April of 1999. Hinz relies on *Norm's, supra,* 173 Cal.App.3d 1121. In *Norm's,* the defendant property owner's property was not part of any existing redevelopment plan. In fact, the redevelopment agency led the defendant to believe that it would be permitted to expand and improve its restaurant business. Without any notice to the defendant that its land would be needed for redevelopment, the redevelopment agency entered into an agreement with a developer in which the redevelopment agency agreed to obtain the defendant's land and transfer it to the developer, who would build condominiums on the site. Before considering a resolution of necessity, the agency issued and sold tax-exempt bonds to finance the acquisition of the defendant's property.

The court concluded that the agency's adoption of the resolution of necessity was a sham and that the agency's board had "simply 'rubber stamped' a predetermined result." (*Norm's, supra,* 173 Cal.App.3d at p. 1127.) The court explained: "By the time the Agency actually conducted a hearing to determine the 'necessity' for taking the property in question, it had, by virtue of its contract with the developer and issuance of revenue bonds, irrevocably committed itself to take the property in question, regardless of any evidence that might be presented at that hearing. All the while the owner had been misled, if not deceived, as to what fate was going to befall his property. [¶] That hearing was thus affected not by just a gross abuse of discretion but by the prior elimination of any discretion whatsoever. The effect of that abuse was, if not to nullify, to deprive the resolution of any conclusive effect on the three critical issues involved." (*Ibid.*)

This case is distinguishable from *Norm's.* Unlike the property owner in *Norm's,* Hinz had years of prior notice that an easement would be required over his property to improve Vessing Road. Hinz attended and participated in most of the public meetings regarding the formation of the VRAD and made his objections to the project known from the start.[10] Unlike *Norm's,* the City had not selected a contractor or issued bonds when it adopted the resolution of necessity condemning Hinz's property. Furthermore, the decision in this case was prompted by the condition of Vessing Road, the VRAD members' desire to improve the road, and the preexisting private easement that provided for the use of a portion of Hinz's property as a road. The fact that the VRAD was formed before the City adopted the resolution of necessity condemning Hinz's property is also the result of a logical progression. If a majority of the members of the VRAD had objected to the project, the project would not have gone forward and there would have been no need to condemn Hinz's property.

Contrary to Hinz's assertion that the city council rubber-stamped the resolution, the record reveals that there was meaningful discussion of the public interest and necessity for the project. The council members were provided with extensive written information regarding the project in advance of the public hearing. The hearing lasted 75 to 80 minutes. Six members of the VRAD spoke. Some voiced concerns regarding the configuration of the road, specifically as it related to a member's hedge. One spoke in opposition to the taking. Hinz's attorney made a statement for the record, opposing the project on the same legal grounds that are advanced on appeal. The council

---

[10] Hinz attended the city council meeting in May 1997 in which the City adopted a series of resolutions relating to the formation of the VRAD. Hinz attended the city council meeting in April 1999, when the members of the VRAD voted to form the district. Hinz's attorney made a statement for the record at the September 1, 1999 city council meeting in which the City voted on Resolution 99-50.

members debated the merits of proceeding with the eminent domain action. One voted in opposition to the resolution.

For all of the foregoing reasons, we concluded that the City did not rubber-stamp the project and that the holding in *Norm's* does not apply.

### C. *Defense Asserting No Public Use*

■ The power of eminent domain may only be exercised to acquire property for a public use. (Code Civ. Proc., § 1240.010.) "Where the Legislature provides by statute that a use, purpose, object, or function is one for which the power of eminent domain may be exercised, such action is deemed to be a declaration by the Legislature that such use, purpose, object, or function is a public use." (Code Civ. Proc., § 1240.010.) This statement in Code of Civil Procedure section 1240.010 avoids the need to provide in each condemnation authorization statute that the taking is one for public use. It also conforms to the general scheme of the new eminent domain law, which eliminates the listing of public uses. (8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 961, p. 519.) "Judicial review to determine the issue of public use is not precluded by the statement [in section 1240.010], but under the case law, the legislative declaration will be accepted unless clearly erroneous." (*Ibid.*) We review the trial court's determination on the issue of public use de novo. (*Cantu v. Pacific Gas & Electric Co.* (1987) 189 Cal.App.3d 160, 163 [234 Cal.Rptr. 365].)

■ The Legislature has determined that condemnation of private property for street improvements is a public use. (Gov. Code, § 40404.) Hinz concedes that in most cases the construction and maintenance of a public road is a public use. However, he asserts that the proposed improvement of Vessing Road is not a public use because the assessment district itself is invalid. We have already determined that any defense based upon the invalidity of the VRAD is time-barred and therefore conclude that a public use defense based on the alleged invalidity of the VRAD is also time-barred.

Hinz also argues that there is no public use because the City found that the project confers no general benefit on the community. As noted above, a finding of no general benefit for the purpose of determining the amount of the assessments does not negate the inherently public nature of this project. Nothing in this record undermines the Legislative conclusion that the construction of a new road is a public use. (Gov. Code, § 40404.) We therefore conclude that the trial court did not err when it rejected Hinz's public use defense.

### Disposition

The judgment is affirmed. Hinz shall recover his costs on appeal pursuant to Code of Civil Procedure section 1268.720.

Premo, J., and Wunderlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 19, 2004.