Filed 8/2/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BROAD BEACH GEOLOGIC HAZARD ABATEMENT DISTRICT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>31506 VICTORIA POINT LLC et al.,<br><br>Defendants and Respondents. | B304699<br><br>(Los Angeles County Super. Ct. No. BC684646) |
| BROAD BEACH GEOLOGIC HAZARD ABATEMENT DISTRICT,<br><br>Plaintiff and Respondent, | B309296<br><br>(Los Angeles County Super. Ct. No. BC684646) |

v.

31506 VICTORIA POINT LLC et
al.,
Defendants and Appellants.

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge. Affirmed.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Ryan Thomas Dunn and Liliane M. Wyckoff; Elkins Kalt Weintraub Reuben Gartside, Kenneth A. Ehrlich and John M. Bowman for Plaintiff and Appellant and Plaintiff and Respondent Broad Beach Geologic Hazard Abatement District.

Burke, Williams & Sorensen, Kevin D. Siegel and Megan A. Burke for League of California Cities, California State Association of Counties, California Special Districts Association, and California Association of GHADs as Amici Curiae on behalf of Plaintiff and Appellant.

Tantalo & Adler and Michael S. Adler for Defendants and Respondents and Defendants and Appellants 31506 Victoria Point LLC, E. Jane Arnault, the Hopkins Family Trust, the WWV Trust and JLA Seawall, LLC.

Greenspoon Marder and Matthew D. Kanin for Defendant and Respondent and Defendant and Appellant Gayle Pritchett Macleod, Trustee of the Pritchett Family Trust.

2

Alston & Bird, Nicki Carlsen, Andrea Warren and Julia Consoli-Tiensvold for Defendants and Respondents Christopher Cortazzo Trust, Zbonfire, LLC, CI Properties, LLC and Three Chips Realty Investments, LLC.

_____

## INTRODUCTION

The City of Malibu formed appellant, the Broad Beach Geologic Hazard Abatement District (the District), to protect the homes on the city's Broad Beach, threatened by longstanding shoreline erosion. The District developed a plan to import sand and maintain a revetment on portions of the beach, in order to fortify the shoreline. To fund this project, it proposed a special assessment on parcels within its boundaries, and homeowners approved the assessment.[1] Litigation ensued, in which the District filed an action seeking to validate the assessment, and the homeowners opposing the assessment claimed it violated the requirements of Proposition 218 (Prop. 218; also known as the Right to Vote on Taxes Act), which added article XIII D to the California Constitution, limiting local government's

_____

[1] "[A] special assessment is 'levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement.'" (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 442 (*Silicon Valley*).)

ability to impose assessments.[2]  (*Apartment Assn. of Los Angeles County, Inc.* v. *City of Los Angeles* (2001) 24 Cal.4th 830, 835.)

Before the trial court, the challengers claimed the District violated Prop. 218 by, inter alia:  (1) failing to consider and exclude from the assessment general benefits

---

[2]  Undesignated article references are to the California Constitution.

The provisions of Prop. 218 require, inter alia, that an assessment be imposed only for a "special benefit" conferred on real property, that any "general benefits" from the relevant project be separated from special benefits, and that the assessment on any parcel be proportionate to the special benefit conferred on it.  (Art. XIII D, §  4, subd. (a).)  A special benefit is defined as "a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large," excluding a general enhancement of property value.  (Art. XIII D, § 2, subd. (i).)  The measure also precludes an assessing agency from exempting parcels owned by public entities from assessment.  (*Ibid.*)

Among the assessment's challengers were the respondents in the District's appeal or their predecessors in interest.  The respondents are: 31506 Victoria Point LLC, E. Jane Arnault, the Hopkins Family Trust, the WWV Trust, and JLA Seawall, LLC (the West End parties); the Christopher Cortazzo Trust, Zbonfire, LLC, CI Properties, LLC, and Three Chips Realty Investments, LLC (the East End Parties); and Gayle Pritchett MacLeod, as trustee of the Pritchett Family Trust (Pritchett).  Some of these parties sold their Broad Beach properties following the trial court's ruling, but continue to have a financial interest in the invalidation of the assessment because of past payments or because they seek an award of attorney fees.

4

from the project, in the form of recreational benefits from the expected wide sandy public beach; (2) failing to consider special benefits from the revetment, which protected only some of the homes on the beach, (3) failing to assess two county-owned parcels that were subject to assessment, and (4) assigning unsupported special benefits to properties on the west end of the beach, which would not receive direct sand placement under the project. The trial court ultimately agreed with the challengers on these issues and invalidated the District's assessment.

After the court's ruling on the merits, the challengers sought attorney fees under Code of Civil Procedure section 1021.5 (Section 1021.5), which codified the private attorney general doctrine of attorney fees. The trial court denied their motions, concluding that each of the challengers had a sufficient financial incentive to bring the litigation without the expectation of a fee award, rendering an award inappropriate. In these consolidated appeals, the District challenges the trial court's invalidation of its assessment, while two appealing assessment challengers (the West End Parties and Pritchett) contest the court's denial of attorney fees.

In its appeal, the District contests all the trial court's grounds for invalidating its assessment. It contends, inter alia, that it was not required to account for general benefits from the widened beach because these recreational benefits did not impose additional costs, were not part of the project's purpose, and were required by state agencies which

5

compelled the District to maintain public access to the beach.[3]

As discussed below, we hold that Prop. 218 required the District to separate and quantify general benefits from the widened beach, regardless of whether those benefits imposed additional costs and without regard to the District's subjective intent in designing the project. That state agencies precluded the District from hindering public access to the improved beach neither removed its general benefits nor exempted them from consideration. We further agree with the trial court that the District was required to consider special benefits from the revetment to relevant homes, and to assess the county-owned parcels.[4] Accordingly, we affirm the court's judgment invalidating the assessment.

In their appeal of the order denying their motions for attorney fees, the challengers claim the court erred, inter alia, in determining they had a meaningful financial interest in the litigation, in calculating the amount of any such interest, and in failing to recognize special circumstances that warranted an award of fees despite such interest. We

---

[3] With our permission, the League of California Cities, the California State Association of Counties, the California Special Districts Association, and the California Association of GHADs filed a brief as amici curiae in support of the District.

[4] We do not decide whether the assessment on west end parcels was sufficiently supported, as we conclude the District has forfeited its contentions on this point by failing to raise them in its opening brief.

discern no error in the court's determination and weighing of the challengers' financial interest in the litigation, and conclude the court was not compelled to award fees to homeowners who were sufficiently incentivized and well able to fund the litigation. We therefore affirm the court's order denying attorney fees as well.

## BACKGROUND

### A. Broad Beach and the Formation of the District

Broad Beach is a roughly one-mile-long public beach in the City of Malibu. Along the beach are 121 private parcels, most of which contain homes, as well as two county-owned parcels containing public-access stairs. Historically a wide beach, Broad Beach has been consistently narrowing since the early 1970s, with its shoreline retreating about 65 feet between 1974 and 2009. It now consists of a narrow strip of sand, and little to no dry beach is present at high tide levels. Continuing erosion threatens the homes along the beach, and several homes were lost or damaged during storm events over the years. In 2010, a voluntary association of Broad Beach residents (the Trancas Property Owners' Association) constructed a temporary rock revetment to protect 78 of the homes at the central and eastern parts of the beach. The temporary revetment was constructed partly on state land, apparently without sufficient authorization.

In June 2011, seeking a long-term solution to the erosion of the beach and the threat to Broad Beach homes, the Trancas Property Owners' Association petitioned the city

to form a geologic hazard abatement district under Public Resources Code section 26500 et seq. The city obliged by forming the District, which encompasses all of Broad Beach.[5]

*B. The Project*

After its formation, the District adopted a plan to provide "sand nourishment" for the beach, proposing to import hundreds of thousands of cubic yards of sand to restore the width of the beach and provide a protective barrier for the District's parcels. The District also sought to obtain a permit for the permanent retention of the temporary revetment.

Following extensive negotiations with the California Coastal Commission (the Commission) to obtain required permitting for the project, the Commission provided a conditional permit for an initial 10-year period, imposing many limitations and requirements on the District. Among other things, the Coastal Commission prohibited the District from placing sand at the west end of the beach, due to environmental concerns. While allowing the District to retain the revetment, the Commission required it to ensure

---

[5]    A geologic hazard abatement district is a political subdivision of the state and may be formed to, among other purposes, prevent, mitigate, abate, or control a geologic hazard. (Pub. Resources Code, §§ 26525, 26570.) In order to achieve its purposes, it has the power, inter alia, to "[a]cquire, construct, operate, manage, or maintain improvements on public or private lands." (*Id.*, § 26580, subd. (a).)

8

the relocation of its eastern portion landward, onto homeowners' lands. Affected landowners agreed to bear the costs of the revetment's relocation and to contribute lands for its new placement. Like the temporary revetment, the planned permanent revetment would not protect all of the homes on the beach.

To mitigate environmental impact from the project's features, including the revetment, the Coastal Commission required the District to create and maintain a system of sand dunes to serve as habitat areas for certain plant and animal life. The Commission also imposed various conditions intended to ensure convenient public access to the beach.[6] Relatedly, the California State Lands Commission

[6] As part of its efforts to ensure public access to the beach, the Coastal Commission required the District to obtain "springing licenses" from owners of property on which the revetment would lie, to allow public passage over private lands to the beach, under certain circumstances. While the trial court sustained a challenge to the assessment relating to this requirement, it is undisputed that this ground is no longer at issue due to changed circumstances following the trial court's judgment. We therefore do not discuss the springing licenses requirement.

The Coastal Commission also imposed technical requirements relating to the minimum width of the nourished beach. Among other things, the Commission provided that if the District failed to consistently maintain "at least a 30-foot wide sandy beach over the 10[-]year period," its application for an additional 10-year term would be required to include an evaluation of all feasible alternatives to the retention of the revetment without changes.

agreed to forgo rent for the revetment's encroachment onto state land, conditioned on the maintenance of at least 10 feet of dry sand seaward of the revetment, to allow unrestricted public access. However, the State Lands Commission required the District to pay $500,000 for the temporary revetment's prior, unauthorized use of state lands.

## C. *The 2017 Assessment and Engineer's Report*

Shortly after its formation, the District proposed an annual assessment on parcels within its boundaries to fund its project on Broad Beach, and the assessment was approved by the property owners. It proposed an adjusted assessment in 2015, after learning that the Coastal Commission would not allow it to deposit sand at the west end of the beach, and this assessment was also approved by the property owners.

In late 2017, after learning of additional regulatory requirements and receiving updated cost estimates, the District proposed another adjusted assessment, which is the subject of this appeal. In support of its proposed assessment, the District produced an engineer's report describing the project and discussing special and general benefits to be generated by it.[7]

---

[7]     Under Prop. 218, a proposed assessment must be supported by "a detailed engineer's report . . . ." (Art. XIII D, § 4, subd. (b).) The assessing agency must notify owners of relevant parcels of the proposed assessment and allow them to vote on it. (Art. XIII *(Fn. is continued on the next page.)*

10

The District divided assessed parcels into three assessment tiers (100 percent, 75 percent, and 25 percent of base rate), based on the expected added beach width in the area in front of a parcel.  Parcels on the west end, which were to receive no direct sand nourishment, were placed in the 25 percent tier, as the report projected they would benefit from westward migration of sand placed elsewhere on the beach.  Vacant parcels were to receive a discounted rate.  The District did not assess the county-owned parcels.  Whether properties would be protected by the revetment was not a factor in the District's methodology.[8]

The engineer's report identified six special benefits from the project:  (1) protection from erosion due to wave action; (2) protection from flooding associated with storms; (3) protection from sea-level rise; (4) access to the beach; (5) prevention of blight; and (6) "consequential protection of properties to the west of the beach improvements to the

D, § 4, subds. (c), (d).)  Votes must then be weighted "according to the proportional financial obligation of the affected property." (Art. XIII D, § 4, subd. (e).)  If a weighted majority of the votes opposes the assessment, it may not be imposed.  (*Ibid.*)

[8]    The properties of most East End Parties were placed in the 100 percent tier, with one vacant lot receiving a discounted rate. The properties of the Pritchett Family Trust and four of the West End Parties were placed in the 25 percent tier.  The property of JLA Seawall, the remaining member of the West End Parties that stood to receive some sand nourishment, was placed in the 75 percent tier.  None of these properties was to be covered by the permanent revetment.

11

extent of natural littoral movement." It concluded the project would not provide substantial general benefits for purposes of Prop. 218. While acknowledging the advantage to the public in the project's addition of publicly accessible beach area, the report stated this result was "legally compelled" in order to satisfy the requirements of state agencies, and thus did not constitute a general benefit for purposes of Prop. 218.

However, seeking to employ a "conservative . . . analysis," the report assumed these benefits would constitute general benefits, and estimated they would amount to "no more than 2 percent of the total benefit generated by the Project." The report asserted that non-assessment resources would fund the general benefits, pointing to the revetment homeowners' agreement to fund and contribute land for the relocation of the revetment. As for the county-owned parcels, which encompassed thousands of square feet each, the report stated that the unassessed special benefits enjoyed by them would also be funded through the revetment homeowners' contribution. The District's 2017 proposed assessment was approved by a weighted majority of the voting homeowners.

### D. Challenges to the 2017 Assessment

A number of homeowners sought a writ of mandate to set aside the District's latest assessment. Given the litigation, the District decided to collect only 10 percent of the difference between the 2017 assessment and the 2015

12

assessment, pending resolution of all legal challenges to its recent assessment.  The District subsequently filed a validation action under Code of Civil Procedure section 860 et seq., to adjudicate all challenges to the assessment in one proceeding, and the trial court related the proceedings. Twelve groups of property owners, including the West End Parties, the East End Parties, and Pritchett, filed answers in the District's action.[9]  The assessment challengers claimed that the District violated Prop. 218 by, inter alia, (1) failing to properly quantify and separate general benefits from the project, (2) failing to consider special benefits from the revetment, (3) failing to assess the county-owned parcels, and (4) assigning unsupported special benefits to the west end properties.

### E. The Trial Court's Ruling on the Merits, and the Challengers' Motions for Attorney Fees

Following a trial on the administrative record, the court invalidated the District's assessment as inconsistent with Prop. 218's requirements.  In a detailed 22-page statement of decision, the court first concluded the District had failed to properly quantify general benefits from the

---

[9]      Initially, in December 2017, only three of the West End Parties -- 31506 Victoria Point, E. Jane Arnault, and the Hopkins Family Trust -- filed an answer opposing the District's validation action.  The remaining two members of the group, JLA Seawall and the WWV trust filed their answers and joined the group in April 2018.

project, finding no support for the argument that "legally compelled" benefits could be disregarded, and finding the District had intentionally sought to "recreate the wide sandy beach that existed in the 1970s." As to the engineer's estimate of up to 2 percent in general benefits, the court noted it was unsupported by any analysis and found it arbitrary. Second, the court agreed with the challengers that the District was required to consider the additional special benefits from the revetment to the homes protected by it. Third, the court found the District was required to assess the county-owned parcels.

Finally, the court concluded the assessment of west end properties was unsupported, finding unreliable the model used by the engineer's report to estimate the amount of added beach expected on the west end of the beach, and faulting the report for providing no analysis of the degree of added protection from projected sand additions. While the District argued the owners of the west end parcels would receive other special benefits, including recreational benefits from the wider sandy beach and protection from blight that would occur if high tides destroyed their neighbors' homes, the court determined these did not constitute special benefits because the general public would enjoy the same benefits.[10]

---

[10]     After the court's ruling, the District circulated a new draft engineer's report and declared its intention to propose a new assessment that complied with the court's decision. However, the District paused its plans for a new assessment in October 2020. We deny as unnecessary the East End Parties' request for

(*Fn. is continued on the next page.*)

14

As discussed more fully below, following the court's entry of judgment, several groups of challengers filed motions for attorney fees under Section 1021.5. The trial court denied their motions. The District timely appealed the trial court's judgment invalidating its assessment, while the West End Parties and Pritchett timely appealed the court's denial of their motions for attorney fees. We consolidated the appeals.

## DISCUSSION

### A. *The District's Appeal of the Trial Court's Invalidation of the Assessment*

Challenging the trial court's invalidation of its assessment, the District claims: (1) it was not required to account for general benefits from the widened public beach because these benefits did not impose additional costs, were not part of the project's purpose, and were required by state agencies; (2) it was not required to consider special benefits from the revetment because this was a preexisting facility, rather than a part of its project; and (3) it was not required to assess the county-owned parcels because the project would benefit the public-access stairs and because any benefit could be funded through non-assessment revenues. For the first time in its reply brief, the District additionally asserts that (4) it properly assigned special benefits to west end

---

judicial notice of resolutions adopted by the District following the court's ruling.

15

parcels because its projection of added beach width from sand migration was reliable, and because those parcels would receive recreational and other special benefits.

As discussed below, we reject each of the District's contentions. First, we hold that Prop. 218 required the District to separate and quantify general benefits from the widened beach, without regard to whether those benefits imposed additional costs or to the District's subjective intent in designing the project. That state agencies' actions would protect public access to the improved beach did not erase the project's general benefits or excuse the District from considering them. Second, we conclude the District was required to consider special benefits from the revetment to relevant homes because substantial evidence supports a finding that it was part of the District's project. Third, we conclude the District was required to assess the county-owned parcels, as the District has not shown they would receive no special benefit, and those parcels cannot be treated more favorably than privately owned parcels. Finally, we find the District has forfeited its contentions regarding the assessment on west end parcels.

### 1. Applicable Law

#### a. Burden of Proof and Standard of Review

In any legal challenge to the validity of a special assessment, the burden is on the assessing agency to demonstrate the validity of the assessment. (Art. XIII D, § 4, subd. (f).) We review the trial court's resolution of

16

factual questions for substantial evidence.  (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 917.)  We then exercise independent judgment in evaluating the validity of an assessment.  (*Silicon Valley*, *supra*, 44 Cal.4th at 448.)

"Our task on appeal is 'to determine and effectuate the intent of those who enacted the constitutional provision at issue.' [Citation.] . . . .  '[W]e begin by examining the constitutional text, giving the words their ordinary meanings.'" (*Valley Baptist Church v. City of San Rafael* (2021) 61 Cal.App.5th 401, 410.)  When the language permits more than one reasonable interpretation, ""'the court looks 'to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, [and] public policy . . . .'""" (*Ibid.*)

### b.  *Prop. 218 and Its Requirements*

Approved by the voters in 1996, Prop. 218 was intended to "'significantly tighten the kind of benefit assessments' an agency can levy on real property [citation] and to "'protect[] taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent.'"" (*Silicon Valley*, *supra*, 44 Cal.4th at 438.)  Thus, the measure instructed that its provisions "shall be liberally construed to effectuate its purposes of limiting local

17

government revenue and enhancing taxpayer consent."[11] (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 5, p. 109.)

As noted, Prop. 218's substantive provisions tended to significantly restrict assessments, requiring assessing agencies to (1) demonstrate special benefits to assessed properties, (2) separate and quantify general benefits, and (3) ensure the assessment is proportionate to a property's special benefit. (Art. XIII D, § 4, subd. (a).) The measure further prohibits the exemption of public entities from applicable assessments. (*Ibid.*) We discuss these requirements below.

### i.    *Special Benefit*

An assessment may be imposed only for a "special benefit" conferred on a particular property. (Art. XIII D, §§ 2, subd. (b), 4, subd. (a).) A special benefit is "a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large," and a "[g]eneral enhancement of property value does not constitute 'special benefit.'" (Art. XIII D, § 2, subd. (i).) "A project confers a special benefit when the affected property receives a 'direct advantage' from the improvement funded by the assessment. [Citation.] By contrast, general benefits are 'derivative and indirect.'

---

[11]    We grant the District's request for judicial notice of Prop. 218's ballot materials.

[Citation.] The key is whether the asserted special benefits can be tied to particular parcels based on proximity or other relevant factors that reflect a direct advantage enjoyed by the parcel." (*Town of Tiburon v. Bonander* (2009) 180 Cal.App.4th 1057, 1077 (*Tiburon*), fn. omitted.)

Beyond the express exclusion of general enhancement of property value, Prop. 218 places no limits on the kind of benefits that may constitute special benefits, so long as they directly advantage the assessed parcel. Courts have recognized such benefits as "expanded or improved access to [an] open space, or improved views of the open space" (*Silicon Valley*, *supra*, 44 Cal.4th at 455 [discussing potential benefits from open-space acquisitions]), "improved aesthetics, increased safety, and improved [utility] service reliability" (*Tiburon*, *supra*, 180 Cal.App.4th at 1078 [benefits from undergrounding of utility lines, based on properties' proximity to existing overhead lines]), and "security [and] streetscape maintenance (e.g., street sweeping, gutter cleaning, graffiti removal)" (*Dahms v. Downtown Pomona Property & Business Improvement Dist.* (2009) 174 Cal.App.4th 708, 722 (*Dahms*) [services provided to properties within assessment district]).

### ii. *Separation and Quantification of General Benefits*

As noted, an assessment may be imposed only for special benefits. (Art. XIII D, §§ 2, subd. (b), 4, subd. (a).) Yet "virtually all public improvement projects provide

general benefits," in addition to any special benefit. (*Beutz v. County of Riverside* (2010) 184 Cal.App.4th 1516, 1531 (*Beutz*).) An assessing agency must therefore "'separate the general benefits from the special benefits conferred on a parcel' and impose the assessment only for the special benefits. (Art. XIII D, § 4, subd. (a).)" (*Silicon Valley*, *supra*, 44 Cal.4th at 443.) Any remaining funding must be obtained through other means. (*Id*. at 450.) These requirements of Prop. 218 superseded prior caselaw, under which courts "did not demand a strict separation of special and general benefits," and upheld assessments imposing the entire cost of a public project on specially benefitted properties, regardless of general benefits. (*Silicon Valley, supra,* at 451, citing, e.g., *Knox v. City of Orland* (1992) 4 Cal.4th 132, 137 [upholding assessment for park maintenance, though city did not separate general benefits to public from special benefits to assessed parcels]; *Allen v. City of Los Angeles* (1930) 210 Cal. 235, 238 [city council could "make the cost of the entire [street improvement project] rest upon the shoulders of the property owners of a given district especially benefited thereby"].)

"Generally, this separation and quantification of general and special benefits must be accomplished by apportioning the cost of a service or improvement between the two and assessing property owners only for the portion of the cost representing special benefits. That is, the agency must determine or approximate the percentage of the total benefit conferred by the service or improvement that will be

20

enjoyed by the general public and deduct that percentage of the total cost of the service or improvement from the special assessment levied against the specially benefitted property owners." (*Golden Hill Neighborhood Assn., Inc. v. City of San Diego* (2011) 199 Cal.App.4th 416, 438 (*Golden Hill*), fn. omitted.) Applying this requirement, the *Golden Hill* court invalidated a city's assessment intended to fund the installation, maintenance, and servicing of public improvements at a city neighborhood: although the engineer's report recognized the measures would provide some general benefits, it deemed them minimal and failed to quantify them. (*Id.* at 424, 439.) Rejecting this approach, the court explained, "[E]ven *minimal* general benefits must be separated from special benefits and quantified so that the percentage of the cost of services and improvements representing general benefits, however slight, can be deducted from the amount of the cost assessed against specially benefitting properties." (*Id.* at 439.)

Similarly, in *Beutz*, the Court of Appeal invalidated a county's assessment on certain residential properties to fund a master plan to acquire and develop parks nearby. (*Beutz, supra*, 184 Cal.App.4th at 1519.) Although the engineer's report "'recognized that the general public may benefit from these parks'" (*id.* at 1527), it included no analysis of "the *quantity* or extent to which the general public may reasonably be expected to use or benefit from the parks in relation to the *quantity* or extent to which occupants of [the neighboring] residential properties . . . may use or benefit

21

from the parks." (*Id.* at 1533.) This deficiency, the court concluded, violated Prop. 218's requirements. (*Beutz, supra,* at 1534.)

The *Beutz* court rejected the challengers' reliance on *Dahms, supra,* 174 Cal.App.4th 708. (*Beutz, supra,* 184 Cal.App.4th at 1537.) In *Dahms,* a property and business improvement district imposed a special assessment to fund certain services, including security and streetscape maintenance, for properties in a city's downtown area. (*Dahms, supra,* at 712-713.) A property owner challenged the assessment on the ground that the special benefits to the downtown properties also produced general benefits (in the form of increased safety for the general public, for example), but that the district failed to separate and quantify those general benefits. (*Id.* at 723.) Rejecting this contention, the court reasoned, "[N]othing in article XIII D says or implies that if the special benefits that are conferred also produce general benefits, then the value of those general benefits must be deducted from the reasonable cost of providing the special benefits before the assessments are calculated." (*Ibid.*) The court explained that the district's services "themselves *constitute*[*d*] special benefits" provided directly to assessed parcels, and contrasted these circumstances with those in which putative special benefits "were merely the alleged *effects* of . . . services directly funded by the assessments . . . ." (*Id.* at 725.) Construing the services at issue as the former, it held that where "the special benefits *themselves* produce certain general benefits, the value of

22

those general benefits need not be deducted before the (caps on the) assessments are calculated." (*Id.* at 723, italics added.)

*Dahms*'s holding as to collateral general benefits stemming from the special benefits to assessed properties has not been extended beyond that limited context. As noted, the *Beutz* court rejected the challengers' reliance on *Dahms*, explaining that unlike *Dahms*, "this case involves . . . the general and special benefits that will accrue, respectively, to members of the general public and occupants of [assessed] properties from their *common use and enjoyment* of the [developed] parks." (*Beutz, supra*, 184 Cal.App.4th at 1537, italics added.)

### iii.   *Proportionality*

An assessment on any given parcel must be proportional to the special benefit conferred on that parcel: "No assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel." (Art. XIII D, § 4, subd. (a).) "The proportionate special benefit derived by each identified parcel shall be determined in relationship to the entirety of the capital cost of a public improvement, the maintenance and operation expenses of a public improvement, or the cost of the property-related service being provided." (*Ibid.*) In other words, "the 'reasonable cost of the proportional special benefit,' which an assessment may not exceed, simply reflects an assessed property's proportionate share of total

23

assessable costs as measured by relative special benefits." (*Tiburon, supra*, 180 Cal.App.4th at 1081.) Thus, for example, if a property receives 20 percent of the total special benefits conferred by a project, the assessment imposed on it may not exceed 20 percent of assessable costs.

### 2. *Analysis*

#### a. *General Benefits from the Improved Beach*

The trial court correctly concluded that the District had failed to properly separate and quantify general benefits from the project. As noted, under Prop. 218, the District was required to quantify general benefits from the project, apportion the project's costs between the special and general benefits, and assess only the portion of the cost representing special benefits. (*Golden Hill, supra*, 199 Cal.App.4th at 438; *Beutz, supra*, 184 Cal.App.4th at 1533-1534.) It is undisputed that the project would create a much wider, sandy public beach. It is likewise undisputed that the added recreational benefit of a wider beach to the general public would ordinarily constitute a general benefit. Accordingly, the District was required to properly quantify this benefit, apportion costs to it, and exclude those costs in determining the allowable assessment. (See *Golden Hill*, at 438; *Beutz*, at 1533-1534.)

The District contends that the expected benefits to the public here should nevertheless be excluded from consideration for three reasons. As discussed below, we find none persuasive.

24

### *i. Additional Costs*

First, relying primarily on *Dahms*, the District suggests that general benefits need not be considered unless they impose additional costs. But as discussed above, *Dahms* addressed general benefits flowing from the special benefits themselves. (See *Dahms, supra,* 174 Cal.App.4th at 723; *Beutz, supra,* 184 Cal.App.4th at 1537.) Where, as here, an improvement directly confers both special and general benefits, courts have required cost apportionment for general benefits, without asking whether the general benefits impose additional costs.[12] (See *Beutz, supra,* at 1533-1534; *Golden Hill, supra,* 199 Cal.App.4th at 439.)

Indeed, the District agrees that a hypothetical in *Golden Hill* "provides the best guidance" regarding the necessary separation of the general benefits. To illustrate the required apportionment, the court in *Golden Hill* provided the following hypothetical example: "if property owners are to be specially assessed for street lighting that will provide both a special benefit for residents of the street and a general benefit to the general public using the street, a reasonable separation and quantification of general and special benefit would be to determine the approximate percentage of daily (or nightly) trips on the street made by the specially benefitted residents as opposed to other members of the public and recoup only that percentage of the

---

[12] Because the rule it enunciated would not apply to the facts here, we need not decide whether *Dahms* correctly construed Prop. 218's provisions.

25

cost of the lighting through the special assessment." (*Golden Hill, supra*, at 438, fn. 18.) The guidance provided by this hypothetical precludes the District's argument: the cost of providing street lighting does not depend on the percentage of trips by members of the general public; yet *Golden Hill* instructs that the allowable special assessment must be reduced by that percentage, which reflects the amount of general benefit to the public. (*Ibid.*)

Under the District's proposed rule, any special benefit, no matter how small, would support an assessment for the entire cost of a project that provides general benefits, no matter how substantial, so long as the project is indivisible and costs cannot be directly attributed to the general benefits. Such a rule would constitute a return to pre-Prop. 218 law and thus be inconsistent with Prop. 218's separation and quantification requirements.[13] (See *Silicon Valley*,

_____

[13] Amici cite *Tiburon* and *City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202 (*Saratoga*) in support of the District's argument. Neither case stands for the proposition. In *Tiburon*, the court concluded the undergrounding of utility lines provided only special benefits, stating, "[T]here is little reason to believe the undergrounding project will confer derivative and indirect benefits upon property owners or others outside the [assessment district]." (*Tiburon, supra*, 180 Cal.App.4th at 1080.) Amici assert that the undergrounding of utilities also benefits the general public, e.g., by eliminating danger to the public from downed utility lines, and speculates that the court's conclusion reflects a holding that such "collateral" benefits need not be considered. However, the *Tiburon* court mentioned no specific assertion of general benefits by the challengers and provided no
(*Fn. is continued on the next page.*)

26

*supra*, 44 Cal.4th at 451; *Golden Hill*, *supra*, 199
Cal.App.4th at 438 & fn. 18; *Beutz*, *supra*, 184 Cal.App.4th
at 1533-1534.)

### ii. Subjective Intent

Second, the District argues the general benefits should
be disregarded because the purpose of the project is to
protect the beach properties, rather than to widen the beach
for recreational purposes.[14] Nothing in the text of Prop. 218,
however, suggests that the assessing agency's subjective
intent in undertaking a public improvement project is
relevant. Instead, the measure's defining a special benefit
simply as "a particular and distinct benefit over and above
general benefits," while excluding a mere increase in
property values (art. XIII D, § 2, subd. (i).), suggests a focus
on real-world effects.

Moreover, a rule that general benefits may be
disregarded based on the agency's intent would create

reasoning that could suggest an adoption of Amici's position.
(See *City of Oakland v. Public Employees' Retirement System*
(2002) 95 Cal.App.4th 29, 57 ["Cases are not authority for
propositions not considered"].) Still less helpful is *Saratoga*, in
which it was undisputed that the improvement of a dead-end
road and the water system that served it provided no general
benefits. (*Saratoga, supra*, at 1225.)

[14] The District challenges the trial court's finding that it
intended to create a wide beach for its own sake. Because we
conclude the District's intent is not determinative, we need not
address this issue.

uncertainty and would not comport with Prop. 218's purposes to "'significantly tighten the kind of benefit assessments' an agency can levy on real property" (*Silicon Valley*, *supra*, 44 Cal.4th at 438) and to "limit[] local government revenue" (Ballot Pamp., *supra*, text of Prop. 218, § 5, p. 109). Consider, for example, the street lighting in *Golden Hill*'s hypothetical. Under the District's proposed rule, in determining whether apportionment of costs to general benefits was required, a court would be tasked with deciding whether the assessing agency subjectively intended the lighting to reduce auto accidents generally, to prevent any and all pedestrians from tripping, to protect children residing in assessed properties from traffic, to deter burglaries to assessed properties, or to achieve some combination of the above. For its part, the assessing agency would be incentivized to narrowly frame the purpose of the project to focus exclusively on special benefits, and to disclaim concern for any issue that would benefit the public. The rule advocated by the District would ultimately lead to the validation of assessments for the entire cost of projects that provide only modest special benefits, relative to general benefits. This loose rule would accord with neither the text of Prop. 218 nor its purpose.

The District cites no authority, and we are aware of none, suggesting that an agency's subjective intent determines the need to account for general benefits. Indeed, the District itself maintains that west end properties would receive a special benefit from their access to a wide sandy

28

beach in front of other parcels. The District cannot treat this recreational value as an assessable special benefit, while ignoring its general benefit to the public. (See *Tiburon*, *supra*, 180 Cal.App.4th at 1088 [assessment approach must be consistently applied].)

### *iii. State Agency Requirements*

Third, the District contends that any general benefit from public access to a wide beach should not be considered because state agencies required it to provide this benefit, either as a condition of the project's approval or as consideration for the revetment's use of state lands. It notes that the Coastal Commission required it to ensure public access, stating, "The restored beach is **public** because the Coastal Commission made it a condition of project approval."[15] It further notes that the State Lands Commission agreed to forgo payments for the use of state lands, conditioned on the maintenance of enough dry sand seaward of the revetment to allow public access. The District claims the enhanced public beach should therefore be seen as part of the costs of the project, rather than general benefits.

---

[15] As noted, the Coastal Commission also imposed requirements relating to the minimal width of the nourished beach. The District disclaims reliance on those requirements, pointing only to the Commission's conditions relating to public access to the beach.

29

We need not decide whether, or under what circumstances, Prop. 218 may excuse accounting for benefits provided in satisfaction of regulatory requirements or as consideration in commercial transactions. The benefit here -- the provision of a wide sandy beach -- is the heart of the District's proposed project, not a mere condition for approval or required consideration by a state agency. That state agencies acted to ensure the project does not *cut off* the public's access to a public beach does not transform the improvement project's general benefits into costs. Were it otherwise, virtually any improvement to a public street or public park that provided a degree of special benefits could be fully funded by a special assessment based on the claim that public access to the improvement could not be restricted, and thus that any benefit to the public should be seen as a cost rather than a general benefit. That is not the law. (See *Beutz, supra*, 184 Cal.App.4th at 1533-1534 [county required to account for general benefits from general public's use of public parks]; *Golden Hill, supra*, 199 Cal.App.4th at 438, fn. 18 [street lighting project would require accounting for general benefits from general public's nightly use of street].) In short, the District was required to apportion costs to general benefits stemming from the creation of a wide and sandy public beach.[16]

_____

[16]     Although our conclusion that the District failed to properly apportion costs to the project's general benefits is sufficient to invalidate the assessment, we proceed to assess the District's remaining challenges to the trial court's ruling in order to guide
(*Fn. is continued on the next page*.)

## b. *Special Benefits from the Revetment*

The trial court did not err in concluding that the District was required to consider the additional special benefits to be conferred on parcels behind the revetment. The District does not dispute the court's finding that the revetment would provide additional protection to the parcels behind it. The District's assessment, however, did not account for the special benefits the revetment would confer on those parcels. In failing to consider these benefits in apportioning assessable costs among all the District's parcels, the assessment violated Prop. 218's proportionality requirement. (See *Tiburon*, *supra*, 180 Cal.App.4th at 1081 [under Prop. 218, assessment may not exceed property's proportionate share of total assessable costs, as measured by relative special benefits].)

In challenging the trial court's conclusion, the District maintains that the revetment should be considered a "'fact on the ground,'" rather than part of the project, and thus that any benefits from it should be disregarded. The West End Parties contend, and the District does not dispute, that whether the revetment was part of the project is a factual question we must review for substantial evidence. Because the District had the burden to prove the validity of the assessment, it must establish that the evidence compelled a finding in its favor as a matter of law. (See *Dreyer's Grand*

the parties and the court should the District propose and obtain approval for a new assessment.

31

*Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 ["where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, . . . . the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law."]  Far from compelling a finding that the revetment was extrinsic to the project, the evidence amply supported a finding that it was an integral part of it.

Distancing itself from the revetment, the District emphasizes that the Trancas Property Owners' Association had constructed the existing, temporary revetment, and that revetment homeowners agreed to fund its relocation and contribute private land for its new placement.  Yet the District concedes that *it* persuaded the Coastal Commission to agree to keep the revetment, subject to its relocation, and that the Commission's conditions of approval for the project required *the District* to ensure the revetment's relocation and to maintain dunes to mitigate the revetment's environmental impact.  The record further shows that the State Lands Commission required the District to pay for the temporary revetment's prior, unauthorized use of state lands.  Under these facts, the court's finding that the revetment was part of the District's planned project was eminently reasonable.[17]

---

[17]    We observe that to the same extent the revetment's benefits are attributed to the project such that they increase the

(*Fn. is continued on the next page*.)

### c. *Assessment of County-Owned Parcels*

The District was required to assess the two county-owned parcels. Prop. 218 instructs, "Parcels within a district that are owned or used by any agency, the State of California or the United States shall not be exempt from assessment unless the agency can demonstrate by clear and convincing evidence that those publicly owned parcels in fact receive no special benefit." (Art. XIII D, § 4, subd. (a).) Given that the project would provide protection to the county's parcels, alongside other parcels in the District, the District was required to assess them. (See *ibid.*)

The District argues there would be no special benefit to those parcels, which contained stairs providing public access to the beach, because the project would not change their function: "Whether the beach is 10 or 100 feet wide, the stairs will continue to provide access to whatever beach there is, with or without nourishment." Yet the District does not expressly contend, let alone demonstrate by clear and

revetment parcels' share of special benefits, any costs associated with the revetment and properly assigned to the District must also be included in the project's costs and be borne by all assessed properties, in proportion to their relative special benefits. (See art. XIII D, § 4, subd. (a) [proportionate special benefit determined in relationship to "the entirety of the capital cost of a public improvement"].) The revetment homeowners' funding of any costs properly assigned to the District and provision of land for the relocation of the revetment may then be credited toward their assessments or treated as a contribution to fund non-assessable general benefits.

convincing evidence, that the project would not protect the stairs and the parcels themselves. And as the West End Parties note, regardless of the stairs, each county parcel encompasses thousands of square feet, and the District has assessed even vacant privately owned parcels.

The District alternatively argues that benefits to the county parcels could be funded through the in-kind contributions of the revetment homeowners, and thus need not be assessed. The relevant benefits, however, are special benefits subject to mandatory assessment, rather than general benefits that require outside funding. The District may not treat the county parcels more favorably than it does privately owned parcels: it may not exempt those parcels from assessment without showing they would receive no special benefit from the project. (Art. XIII D, § 4, subd. (a).) Because it made no such showing, it was required to assess the county parcels. (See *ibid.*)

### d. *Special Benefits to West End Properties*

As noted, the trial court concluded the District's assessment of properties on the west end of Broad Beach, where no additional sand was to be placed directly, was unsupported. While the District contended those properties would receive additional protection due to the migration of sand deposited elsewhere on the beach, the court found a lack of foundation for the District's estimate of the amount of added sand and faulted the engineer's report for failing to discuss the expected degree of added protection. As for the

34

District's contention that west end properties would receive recreational and other benefits from the adjacent wide sandy beach, the court concluded these would not constitute special benefits because the wider beach would similarly benefit the general public.

In its opening brief, the District fails to address the trial court's conclusions as to the west end properties. For the first time in its reply brief, the District contends its estimate of the amount of added sand on the west end of the beach was sufficiently supported, and that west end properties would receive special recreational and other benefits from the project.[18] By failing to raise these arguments in its opening brief, the District has forfeited them.[19] (See *Browne v. County of Tehama* (2013) 213

---

[18] Even in its reply brief, the District does not contest the court's conclusion that the engineer's report improperly failed to assess the degree of added protection from any added sand.

[19] Nothing prevents the District from presenting additional support for any future assessment on west end properties. We express no opinion on the validity of any such future assessment. We observe, however, that a property may derive special benefits from an adjacent public improvement, even if the improvement provides benefits of a similar category to the general public. The assessed property's proximity to the improvement may so enhance its benefit as to render it "a particular and distinct benefit over and above general benefits." (Art. XIII D, § 4, subd. (a); see *Silicon Valley, supra*, 44 Cal.4th at 452, fn. 8 [proximity to public park may provide special benefits]; *Golden Hill, supra*, 199 Cal.App.4th at 438, fn. 18 [recognizing that street lighting could provide both special benefit to residents and general benefit *(Fn. is continued on the next page.)*

35

Cal.App.4th 704, 726 [failure to raise contention in opening brief constitutes forfeiture]).

***

In sum, we conclude the 2017 assessment violated Prop. 218 because in formulating it, the District failed to properly separate, quantify, and apportion costs to general benefits from the project, failed to consider special benefits from the revetment, and failed to assess county-owned parcels. Accordingly, we affirm the court's judgment invalidating the assessment.

### B. The Challengers' Appeal of the Denial of Attorney Fees

#### 1. Background

Following the trial court's entry of judgment, six groups of challengers separately moved for attorney fees under Section 1021.5.[20] One group of five litigants sought

---

to public, to be apportioned by percentage of each group's nightly trips on street]; *Beutz*, *supra*, 184 Cal.App.4th at 1533-1534 [public parks would provide both special benefits to neighboring properties and general benefits to public; engineer's report failed to quantify these benefits according to degree of parks' expected use by each group].)

[20] Section 1021.5 provides, in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (*Fn. is continued on the next page.*)

about $1.5 million in fees. The West End Parties sought about $370,000 in fees, and the East End Parties sought about $270,000.[21] Two other challengers requested smaller amounts, and finally, Pritchett sought about $36,500 in fees. In all, the challengers sought over $2.4 million for the work of more than two dozen attorneys. None suggested counsel had been retained on a contingency basis. The District opposed the challengers' motions, arguing their individual financial stakes in the litigation made any award of attorney fees inappropriate.

In a detailed decision, the trial court ultimately denied all the challengers' motions, concluding that each group's expected economic benefit from the litigation exceeded its litigation costs by a substantial margin, that each group had sufficient financial incentives to justify the litigation in economic terms, and that an award of fees was unwarranted. The court rejected the challengers' argument that they derived no pecuniary benefit from the invalidation of the 2017 assessment because the District could impose a new

_____

(a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

[21]     As noted, three of the West End Parties opposed the District's validation action from the outset, in December 2017, while the remaining two joined the group in April 2018.

assessment. It concluded that the possibility of a new assessment was too speculative to undermine the challengers' benefits, reasoning that the District had "several substantial hurdles to overcome before it could issue a constitutional assessment," including "the terms of the coastal development permit and whether the [D]istrict's property owners will authorize any proposed [new assessment] based on costs . . . ." Addressing the challengers' concern that if a subsequent assessment were invalidated, they would "continually have a problem meeting their burden under Section 1021.5," the trial court stated it could not predict what "'value judgment'" it might make in the future based on Section 1021.5's factors, citing *City of Oakland v. Oakland Police & Fire Retirement System* (2018) 29 Cal.App.5th 688, 700 (*Oakland*).[22]

In calculating each group's financial benefit, the court considered only the annual difference between the invalidated 2017 assessment and the unimpeached 2015 assessment. Based on the scope of the District's project, which contemplated "'at least 20 years'" of various actions on the beach, the court applied a 20-year "valuation period," and thus multiplied the annual difference between the

_____

[22]     The cited portion of *Oakland* states that in making a "'value judgment'" in determining whether an award of fees is appropriate given the litigant's financial incentives, the court should sometimes award fees even where the litigant's expected benefits exceed its actual costs by a substantial margin. (*Oakland, supra*, 29 Cal.App.5th at 700.)

38

assessments by 20.  In doing so, the court rejected the challengers' contention that it should estimate their benefits based on the 10-year period of the project's initial permit. The court then reduced the resulting amounts by 50 percent, to reflect the parties' probability of success at the outset of the litigation, although it remarked that given the multiple flaws in the 2017 assessment, the probability of success was actually "somewhat higher than 50 percent."

As relevant here, using this methodology, the trial court determined that at the outset of the litigation, the West End Parties had an expected benefit of over $550,000 (reduced from an actual benefit of over $1.1 million), which substantially exceeded their litigation costs of about $370,000.  Although the West End Parties argued that the court should consider the expected benefit to only the three original members of their group, the court declined to decide the issue after finding it would not meaningfully change the group's cost-benefit analysis.  The court determined that Pritchett had an expected benefit of $160,000 (reduced from an actual benefit of $320,000), which substantially exceeded the trust's litigation costs of about $36,500.[23]  The West End

[23]    As noted, the court similarly determined that the other challengers' expected benefits substantially exceeded their litigation costs.  The precise amounts attributed to those parties are not pertinent here.

Parties and Pritchett now challenge the court's order denying their motions.[24]

### 2. Applicable Law

"Section 1021.5 codifies the 'private attorney general' doctrine of attorneys fees articulated in *Serrano v. Priest* (1977) 20 Cal.3d 25 . . . and other judicial decisions." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 634.)  The statute's purpose is to compensate with attorney fees "litigants and attorneys who step forward to engage in public interest litigation when there are insufficient financial incentives to justify the litigation in economic terms." (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1211 (*Whitley*).)  It therefore gives the trial court discretion to award fees to a successful party if "'(1) plaintiffs' action "has resulted in the enforcement of an important right affecting the public interest," (2) "a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons" and (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate."'" (*Id.* at 1214.)  The party requesting fees has the burden of proving its eligibility under Section 1021.5. (*Vosburg v. County of Fresno* (2020) 54 Cal.App.5th 439, 450

---

[24]    We deny requests by the District and Pritchett for judicial notice of documents relating to the challengers' efforts to collect refunds of past payments under the 2017 assessment.

(*Vosburg*).)  At issue in this case is only whether the financial burden of the litigation made the award appropriate.

"In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield.  "'An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.'"'" (*Whitley*, *supra*, 50 Cal.4th at 1215.)

In *Whitley*, the California Supreme Court described with approval a method for weighing the costs and benefits of litigation described in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1.  Under this method, in assessing the benefits from the litigation: "'The trial court must first fix—or at least estimate—the monetary value of the benefits obtained by the successful litigants themselves . . . .  Once the court is able to put some kind of number on the gains actually attained it must discount these total benefits by some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome . . . .  Thus, if success would yield . . . the litigant group . . . an aggregate of $10,000[,] but there is only a one-third chance of ultimate victory[,] they won't proceed—as a rational matter—unless

41

their litigation costs are substantially less than $3,000.'" (*Whitley*, *supra*, 50 Cal.4th at 1215.) "'The reason for the focus on the plaintiff's expected recovery at the time litigation decisions are being made, is that [the statute] is intended to provide an incentive for private plaintiffs to bring public interest suits when their personal stake in the outcome is insufficient to warrant incurring the costs of litigation.'" (*Id.* at 1221.) A plaintiff's financial stake in the matter can outweigh the costs of litigation even in the absence of a monetary award, and the court must take other forms of financial incentives into account. (See *Summit Media LLC v. City of Los Angeles* (2015) 240 Cal.App.4th 171, 193 (*Summit Media*) ["The trial court is not required to (and indeed may not) take financial incentives out of the calculation, or conclude there are none, simply because the plaintiff sought no monetary award in the litigation"]; see also *id.* at 188, 193-194 [company had sufficient stake in litigation to invalidate agreement between city and its competitors, as it believed agreement would be ruinous to its business]; *California Licensed Foresters Assn. v. State Bd. of Forestry* (1994) 30 Cal.App.4th 562, 572-573 (*CFLA*) [association of foresters had sufficient financial stake in litigation challenging regulation that would have significantly reduced its members' income].)

"'After approximating the estimated value of the case at the time the vital litigation decisions were being made, the court must then turn to the costs of the litigation—the legal fees, deposition costs, expert witness fees, etc., which

42

may have been required to bring the case to fruition . . . . [¶] The final step is to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case.'" (*Whitley*, *supra*, 50 Cal.4th at 1215-1216.) Applying this method, a party seeking fees will be eligible for an award unless the expected value of the party's financial interest "'exceeds by a substantial margin the actual litigation costs.'" (*Id.* at 1216.)

In making the final value judgment as to whether a bounty of court-awarded fees is appropriate in a particular case, additional considerations beyond the prevailing party's financial benefits may be relevant. (*Oakland*, *supra*, 29 Cal.App.5th at 703-704, 708.) In "unusual case[s]," where a party would have been unable to fund the litigation without the expectation of a fee award, an award may be warranted even where the estimated value of the case substantially exceeds costs. (*Id.* at 703; see also *id.* at 700 ["the interrelatedness of the section 1021.5 factors 'means the court sometimes should award fees even in situations where the litigant's own expected benefits exceed its actual costs by a substantial margin'"].)

"The award of fees under section 1021.5 is an equitable function, and the trial court must realistically and pragmatically evaluate the impact of the litigation to determine if the statutory requirements have been met. [Citation.] This determination is 'best decided by the trial

43

court, and the trial court's judgment on this issue must not be disturbed on appeal "unless the appellate court is convinced that it is clearly wrong and constitutes an abuse of discretion."'" (*Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 334 (*Concerned Citizens*).) However, we review de novo whether the trial court applied the proper legal standards in reaching its determination. (*Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 391.)

### 3. Analysis

In challenging the trial court's denial of their motions for attorney fees, both Pritchett and the West End Parties contend that any financial benefit to them in invalidating the District's 2017 assessment is too indirect and speculative, given the possibility of a new increased assessment in the future, and thus that an award of fees was necessary. The West End Parties additionally argue that the court erred in calculating the amount of financial benefits to assessment challengers, asserting the court should have (1) considered the expected recovery of only the three original West End Parties, rather than all five West End Parties, (2) assumed the assessment would be collected for only 10 years, rather than 20; and (3) accounted for the District's decision to collect a reduced assessment during the pendency of litigation. Finally, Pritchett claims the court erroneously concluded that where assessment challengers' financial benefits outweigh litigation costs, a fee award is

44

categorically precluded, and that unusual circumstances compelled an award here.

As explained below, we discern no error in the court's calculation of the challengers' financial benefits from the litigation, or in its finding that their financial interests exceeded their litigation costs by a substantial margin. Under these circumstances, it cannot be said that ""“the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to [the party's] individual stake in the matter.”"" (*Whitley, supra,* 40 Cal.4th at 1215.) Moreover, contrary to Pritchett's argument, the court did not assume that a fee award was categorically precluded where a party's financial benefit substantially outweighed its costs, and the court was not compelled to award fees to parties that had sufficient incentive to litigate the matter and faced no meaningful obstacle in funding the litigation.

### a. *The Possibility of a New Assessment*

The possibility that the District would impose a new assessment did not render the challengers' financial benefits so uncertain as to require an award of attorney fees. The 2017 assessment's invalidation resulted in expected savings to the challengers equal to the difference between the 2017 assessment and the 2015 assessment. Although they received no monetary award, these expected savings incentivized the challengers to oppose the District's action, and were properly considered by the trial court. (See

45

*Summit Media, supra*, 240 Cal.App.4th at 193-194; *CFLA, supra*, 30 Cal.App.4th at 572-573.)

The trial court reasonably concluded that the possibility of a new assessment was too speculative to undermine these expected benefits. Any new assessment by the District would require a difficult multiple-step process and would face significant challenges at each step. The District would have to approve a new assessment, adjusted to account for the significant flaws identified in the 2017 assessment.[25] Among other things, the district would be required to account for general benefits from the project, meaning it would be required to obtain or identify a non-assessment source of funding for costs apportioned to those benefits.[26] Additionally, it would have to account for special benefits to revetment parcels, meaning that the assessment might impose higher rates on those parcels (and lower rates on non-revetment parcels, including those of the assessment challengers). If approved by the District, the imposition of any new assessment would be contingent on

---

[25] The parties have not asked us to review the draft engineer's report contemplated by the District after the trial court rendered its decision on the merits for compliance with Prop. 218's requirements, and we decline to do so sua sponte. In any case, as noted, the parties agree that the District paused its plans for a new assessment in October 2020.

[26] Contrary to Pritchett's suggestion, the trial court did not merely prohibit the District from "tak[ing] the improper shortcut of a flawed, flimsy, engineer's report . . . ." Rather, the court found the assessment's methodology wanting.

the approval of a weighted majority of the property owners. (Art. XIII D, § 4, subds. (c)-(e).) Because of modifications to the assessment -- particularly any higher rates imposed on revetment parcels -- some property owners who supported the 2017 assessment might well decide to oppose the new one. Even if approved by the property owners, the new assessment could face litigation challenges under the strict requirements of Prop. 218.

Given these challenges, and despite its apparent commitment to the project, the District could at any point decide to give up on the project and seek a less costly alternative that the 2015 assessment could fund. And even if fully successful, a new assessment would likely impose lower rates on non-revetment parcels, including Pritchett and the West End Parties, meaning that the invalidation of the 2017 assessment would still financially benefit them. The assessment challengers provided no evidence compelling the conclusion that their expected pecuniary benefits were too uncertain. (See *Vosburg*, *supra*, 54 Cal.App.5th at 450.)

Neither the West End Parties nor Pritchett cites any case holding that a theoretical possibility that a litigant's financial benefits would be reduced by a future occurrence compels the trial court to award fees.[27] As noted, this issue

---

[27] The cases they do cite are inapposite. In each, the appellate court merely found no abuse of discretion in the trial court's award of fees, and in each, financial benefits were far less direct or certain than the financial benefits here. (See *People v. Investco Management & Development LLC* (2018) 22 Cal.App.5th

(*Fn. is continued on the next page.*)

47

is "'best decided by the trial court,'" and the court's judgment must not be disturbed unless "''clearly wrong.'"" (*Concerned Citizens*, *supra*, 131 Cal.App.4th at 334.)  Neither Pritchett nor the West End Parties have demonstrated an abuse of discretion in the trial court's determination that the assessment's invalidation financially benefitted the challengers.

---

443, 448, 450-451, 468-470 [affirming fee award where investors who intervened in security fraud action gained no financial benefit, and secured only right to sue]; *Boatworks, LLC v. City of Alameda* (2019) 35 Cal.App.5th 290, 309-310 [affirming fee award to developer who successfully challenged city's development fees; trial court discounted developer's financial benefit because developer estimated there was no more than 50 percent chance city would approve viable project, and Court of Appeal added that city would presumably adopt a new, valid fee]; *Heron Bay Homeowners Assn. v. City of San Leandro* (2018) 19 Cal.App.5th 376, 387-388, 392 [affirming fee award where plaintiffs obtained writ compelling city to prepare environmental impact report; although city argued plaintiffs avoided substantial losses in home values from planned project, report would not preclude project, and there was minimal evidence regarding amount of projected losses]; *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714 [similar]; *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1128 [similar].)

> b. *The Trial Court's Calculation of Financial Benefits*
>
> > i. *The Court's Consideration of All West End Parties' Interests*

In comparing the assessment challengers' financial interests in the litigation to the costs of litigation, the trial court correctly considered the financial benefits to all West End Parties against the costs to the same parties. Our Supreme Court in *Whitley* endorsed a simple comparison of the expected benefits to and the costs borne by a single group of litigants. (See *Whitley*, *supra*, 50 Cal.4th at 1215-1216.) Under this method, in determining the expected benefits to the litigants, the court must determine the value of the benefits actually obtained and discount it by an "'estimate of the probability of success at the time the vital litigation decisions were made.'" (*Id.* at 1215.) The trial court faithfully applied this method, finding that the West End Parties had obtained economic benefits worth about $1.1 million, reducing it by 50 percent to about $550,000 to account to for its estimate of their likelihood of success at the outset of the litigation, and determining that these expected benefits exceeded their litigation costs of about $370,000 by a substantial margin.

Citing *Whitley*'s reference to the time of vital litigation decisions, the West End Parties note that initially, only three of the group's members opposed the District's validation action, with the other two members joining them

49

a few months later.  They argue that under *Whitley*, the trial court was required to consider the expected benefits to only the original three West End Parties.  We disagree.

*Whitley*'s reference to the time of vital litigation decisions was intended to account for the risk of non-recovery, instructing courts to make an "'estimate of the probability of success'" at that time.  (See *Whitley*, *supra*, 50 Cal.4th at 1215.)  In so doing, our Supreme Court contemplated the weighing of the expected recovery at the relevant time against the ultimate costs for the same prevailing parties; it did not contemplate accounting for changes in the parties' composition.  (See *ibid.* ["'if success would yield . . . *the litigant group* . . . an aggregate of $10,000[,] but there is only a one-third chance of ultimate victory[,] they won't proceed—as a rational matter—unless their litigation costs are substantially less than $3,000'" (italics added)].)

We do not hold that a court may never consider the joinder (or omission) of parties in assessing a litigant group's financial interest in the outcome of the litigation.  Such considerations may be required under appropriate circumstances, to ensure that plaintiffs lacking a sufficient stake in the litigation may receive a necessary incentive.  (See *Whitley*, *supra*, 50 Cal.4th at 1221 ["'Code of Civil Procedure section 1021.5 is intended to provide an incentive for private plaintiffs to bring public interest suits when their personal stake in the outcome is insufficient to warrant incurring the costs of litigation'"].)  But here, the West End

Parties seek a slanted assessment that compares the financial benefits of just three of the parties to the costs borne by all five. They do not suggest that the two added parties, which joined in the early stages of the case, did not share in the costs.[28] And there is no basis to assume that the litigant group would have incurred the same amount in costs -- about $370,000 -- without their assistance in funding this costly litigation. Indeed, the West End Parties' litigation costs far exceeded those of Pritchett, the East End Parties, and two other assessment challengers, and were second to those of only one other group of five litigants. Under these circumstances, it would not have been appropriate for the court to assess the financial interest of only some of the West End Parties.[29]

---

[28] The West End Parties contend that upon filing their answer, the three original members of their group "committed . . . to pay the entire costs of opposing validation . . . ." To the extent they suggest those members gave their counsel a blank check at the outset of the litigation or somehow bound themselves never to withdraw or settle in the face of mounting costs, they cite nothing in the record supporting such claims.

[29] Because the trial court's ruling on this issue was correct and its resulting determination of the West End Parties' financial interests valid, we need not consider its reasoning that consideration of only the initial three parties would have made no difference in the analysis. (See *Muller v. Fresno Community Hospital & Medical Center* (2009) 172 Cal.App.4th 887, 906-907 ["it is the ruling, and not the reason for the ruling, that is reviewed on appeal"].)

## ii. *The Court's Estimation of the Project's Duration*

The trial court did not abuse its discretion in estimating the life of the project at 20 years. The court based its estimate on the intended scope of the project, which contemplated "'at least 20 years'" of various actions. In challenging the court's calculation, the West End Parties note that the Coastal Commission permitted the project for only 10 years, and provided that if the District failed to consistently maintain a 30-foot wide sandy beach over the initial 10-year period, its application for an additional 10-year term would be required to include an evaluation of all feasible alternatives to the retention of the revetment without changes. The West End Parties state they are "skeptical that the [District] [could] . . . maintain such a wide sand beach, given that extended beach erosion was the very reason that the [District] was formed." According to the West End Parties, if the District failed to achieve this goal, "the project [would] be unlikely to be renewed and the [District] [would] have to consider other options[,] such as a much cheaper revetment-only option." And if successful, "then the expenses of maintaining the beach in years eleven to twenty are likely to be less than the full amount authorized by the [2017] Assessment."

The West End Parties' contentions are sheer speculation regarding the likelihood of future scenarios. The Coastal Commission could decide to renew the project's permit, with or without changes, despite the District's

failure to maintain 30 feet of dry sand. Alternatively, the District could succeed in that task while still requiring the full amount of the assessment because its continued success depended on additional expensive sand nourishment. The West End Parties' bare assertions to the contrary do not demonstrate an abuse of discretion in the trial court's estimate that the project would last for 20 years. (See *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 834, fn. 13 [speculation does not establish abuse of discretion].)

### iii. *The District's Reduced Collection During the Litigation Period*

For the first time on appeal, the West End Parties contend that in its calculation of their financial benefits from the litigation, the trial court should have accounted for the District's decision to collect only 10 percent of the difference between the 2017 and 2015 assessments during the pendency of the litigation. The West End Parties state that the trial court assumed 20 years of assessments, and note that for at least some of those years, the District collected only a small portion of the increased assessment. They argue the court was therefore required to reduce its calculation of their expected benefit in accordance with the District's reduced collection during those years, rather than assume 20 years of full collection.

Initially, the West End Parties have forfeited this contention by failing to raise it below. (See *People v. Redd*

(2010) 48 Cal.4th 691, 718 [contention not raised in trial court was forfeited].) Moreover, their argument rests on a mistaken premise. Rather than assume 20 years of annual assessments, the trial court used a 20-year "valuation period" -- the *equivalent* of 20 years of the full assessment -- based on an assumption that the project itself would last for 20 years. It is undisputed that if the 2017 assessment were validated, the District would have been able to continue to collect it in full for as long as necessary to fund its project, even beyond the life of the project. Under these circumstances, the court need not have considered the District's temporary collection policy.

### c.  *Necessity of an Award Despite Sufficient Financial Incentives*

Contrary to Pritchett's contention, nothing suggests the trial court believed a fee award was categorically precluded where a party's financial benefit substantially outweighed its costs. Indeed, in addressing the challengers' concern that if a subsequent assessment were invalidated, they would "continually have a problem meeting their burden under Section 1021.5," the trial court made clear that it could not predict what "'value judgment'" it might make in the future based on Section 1021.5's factors, citing *Oakland*'s explanation that courts should sometimes award fees even where the litigants' expected benefits exceed their costs by a substantial margin.

54

Nor were there any unusual circumstances that compelled an award of fees to the Pritchett Family Trust. The trust owned beachfront property in Malibu and did not claim poverty. Indeed, Pritchett does not dispute the District's characterization of the assessment challengers as "wealthy landowners." As far as the record shows, the trust could, and did, fund its litigation, on a non-contingency basis, incurring about $36,500 in fees while standing to gain a benefit valued at $320,000, which the court then discounted by 50 percent in accounting for the probability of success.

Pritchett's attempt to compare the trust's circumstances to those of the litigants in *Oakland* is unpersuasive. There, an association of retirees from a city's police department intervened in litigation in which the city contended the retirees were being overcompensated and demanded prospective and retroactive reductions to their benefits. (*Oakland*, *supra*, 29 Cal.App.5th at 694-695.) The association largely succeeded in minimizing the pension cuts, but the trial court denied it attorney fees because the financial interests of the association and its membership in the litigation were much greater than the costs incurred. (*Id.* at 697, 702.) The Court of Appeal reversed. Noting that courts should sometimes award fees even where the litigant's expected benefits exceed its actual costs by a substantial margin, it concluded this was "just such an unusual case." (*Id.* at 703.) In support, the *Oakland* court pointed to the association's "relative poverty" (*id.* at 708) and

55

described in detail the special circumstances that rendered the litigation "financially infeasible for the Association absent the prospect of a fee award" (*id.* at 704). It noted, for example, that (1) the association had difficulty communicating with its elderly members, many of whom were scattered throughout the country, lacked internet access, lived in care homes, etc., (2) its limited staff could not reasonably have obtained financial commitments from its membership, (3) the association had low membership dues and no authority to assess its members more than $100 without a membership vote, and (4) no "new money was on the table," meaning that the monetary value of the litigation "was not of the kind that could easily be accessed to fund the litigation." (*Id.* at 703.)

Although no new money was on the table in this case, the family trust was hardly in the financial position of the retirees' association in *Oakland*. Pritchett does not contend otherwise. Instead, Pritchett highlights that the trust's property was a defendant in an in rem action by a well-resourced government entity. But these circumstances make no difference here. The fact remains that Pritchett was both sufficiently incentivized to oppose the District's action and well able to fund the litigation efforts. Under these circumstances, an award of fees was not appropriate.[30]

---

[30] Pritchett additionally argues that the court erroneously failed to consider a reduced award. (See *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 942 ["if the trial court concludes that plaintiffs' potential financial gain *(Fn. is continued on the next page.)*

Section 1021.5 was not intended to award dividends to litigants who, like the challengers here, are motivated to pursue their private financial interests without the need of added incentives and are sufficiently resourced to seek judicial redress without a promise of assistance.

---

. . . is such as to warrant placing upon them a portion of the attorney fee burden, [Section 1021.5's] broad language and the theory underlying the private attorney general concept would permit the court to shift only an appropriate portion of the fees to the losing party or parties"].)  Nothing in the record suggests the court was unaware of its discretion to grant a reduced award.  Pritchett cites no authority, and we are aware of none, suggesting the court must make an express consideration of a reduced award.

## DISPOSITION

The trial court's judgment is affirmed. Its order denying attorney fees is affirmed. The East End Parties are entitled to their costs on appeal. The remaining parties shall bear their own costs.

**CERTIFIED FOR PUBLICATION**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.